[Cite as *Kindig v. Kindig*, 2010-Ohio-4805.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

JERRY L. KINDIG, II,

    PLAINTIFF-APPELLANT,          CASE NO. 1-10-13

    v.

MARILYN J. KINDIG,          O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Allen County Common Pleas Court
Domestic Relations Division
Trial Court No. DR 2008 0338

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

Date of Decision:    October 4, 2010

APPEARANCES:

    *John L. Straub* for Appellant

    *Matthew C. Huffman* for Appellee

Case No. 1-10-13

**PRESTON, J.**

{¶1} Plaintiff-appellant, Jerry L. Kindig ("Jerry"), appeals the Allen County Court of Common Pleas' judgment of divorce from defendant-appellee, Marilyn J. Kindig ("Marilyn"). For the reasons that follow, we affirm, in part, and reverse, in part.

{¶2} Jerry and Marilyn were married on July 7, 1984. (Complaint, Doc. No. 1). Three children were born as issue of the marriage: Jerry Lynn III (d.o.b. 1992); and Faith Christine and Noah Christian, twins (d.o.b. 2003). (Id.).

{¶3} On June 12, 2008, Jerry filed a complaint for legal separation in the Allen County Court of Common Pleas alleging gross neglect, extreme cruelty, and incompatibility. (Id.). On June 25, 2008, Marilyn filed an answer denying the alleged gross neglect and extreme cruelty but admitting to their incompatibility, and Marilyn filed a counterclaim for divorce. (Doc. Nos. 10, 11). On August 13, 2008, Robert B. Fitzgerald was appointed as Guardian Ad Litem of the minor children. (Doc. No. 33).

{¶4} On April 16, 2009 and August 24, 2009, the trial court held hearings on the matter. Over the course of the two hearings, the parties stipulated to the division of multiple items, including: bank accounts, family loans, two pieces of real estate, IRA accounts, personal property, automobiles, health savings accounts, and other items. (Dec. 21, 2009 JE, Doc. No. 108). Jerry and Marilyn further

stipulated that Marilyn would pay Jerry $3,600/month in spousal support for seventy-two (72) months, subject to a few exceptions, and Jerry would pay Marilyn $744.42/month in child support. (Id.). Jerry and Marilyn also stipulated that Marilyn should be designated as the residential parent of Jerry Kindig, III, and the parties entered into a shared parenting plan with regard to all of the children. (Id.); (Jan. 15, 2010 JE, Doc. No. 110). After the stipulations, the assets that still needed to be divided by the trial court included: Marilyn's medical practices, Women's Health for Life, Inc. and Doctor's Laser Center, L.L.C., as well as a medical laser; CompuLink Financial, Ltd. and CompuLink Services, L.L.C., operated by Jerry; a 2005 Jeep; farmland; a motor home; medical school loans; and a few other miscellaneous items.

{¶5} On September 21, 2009, Jerry and Marilyn filed post-trial briefs. (Doc. Nos. 99-100). On January 15, 2010, the trial court granted Marilyn's counterclaim for divorce on the grounds of incompatibility and that the parties had lived separate and apart in excess of one year without cohabitation as husband and wife. (Doc. No. 110). The trial court's entry also set forth its orders with regard to property division, spousal support, child support, and child custody. (Id.).

{¶6} On February 12, 2010, Jerry filed a notice of appeal. Jerry now appeals raising four assignments of error for our review.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO CONSIDER THE MARITAL ASSET CREATED BY THE COMPULINK FINANCIAL LOANS TO WOMEN'S HEALTH FOR LIFE, INC.**

**{¶7}** In his first assignment of error, Jerry argues that the trial court erred by failing to consider the marital asset created by several loans CompuLink Financial made to Women's Health for Life (WHFL) during the course of the marriage. Jerry asserts that the trial court's failure to consider this marital asset was an abuse of its discretion. Marilyn, on the other hand, argues that the trial court properly considered the notes securing loans by CompuLink Financial to WHFL as related party debt, which marital asset and marital debt offset each other.

**{¶8}** Trial courts have broad discretion in determining the equitable distribution of property in divorce cases; and therefore, an appellate court reviews the overall appropriateness of a trial court's property division under an abuse of discretion standard. *Martin v. Martin*, 3d Dist. No. 9-03-47, 2004-Ohio-807, ¶6, citing *Lust v. Lust*, 3d Dist. No. 16-02-04, 2002-Ohio-3629; *Bisker v. Bisker* (1994), 69 Ohio St.3d 608, 635 N.E.2d 308; *Martin v. Martin* (1985), 18 Ohio St.3d 292, 480 N.E.2d 1112. Abuse of discretion implies that the court's attitude in making a decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140.

**{¶9}** We cannot conclude that the trial court abused its discretion as Jerry argues. Contrary to Jerry's assertion, the trial court *did* consider the marital asset created by promissory notes owned by CompuLink Financial in its judgment entry, but found that the funds CompuLink Financial loaned to WHFL were "an advancement that was made from marital funds." (Dec. 21, 2009 JE, Doc. No. 108). In fact, Jerry testified that that the funds CompuLink Financial loaned to WHFL were taken from an arbitration award in *Marilyn*'s favor. (Aug. 24, 2009 Tr. at 88-90). Furthermore, Robert Sielschott, WHFL's CPA and certified valuation analyst, testified that the monies owed to CompuLink Financial by WHFL did not affect WHFL's value. (Id. at 167-71). Sielschott testified, in pertinent part:

> **Q: * * * in terms of a valuation of this practice, do these moneys that would be, uh, at least on paper owed by Womens Health to (sic) Life for Compulink Financial, did…did that affect the valuation of this practice on 12-31-07?**
> **A: It shouldn't.**
> **Q: Why is that?**
> **A: Well for several reasons. First of all, it's a related party debt in...in marital relations cases they're always disregarded because they're non-consequential. They are by arithmetic, simply don't matter. If you put them in on one side as a liability, you have to put them in on…on the other side as an asset, and it's non-consequential. So put them in or don't put them in, it simply doesn't matter arithmetically in the final settlement of the case. * * ***

(Id. at 170-71). After reviewing the evidence, the trial court ultimately decided to award CompuLink Financial to Jerry and WHFL to Marilyn free of any claims by

the other party. (Jan. 15, 2010 JE, Doc. No. 110). The trial court noted in its decision that "there are no funds owed from [WHFL] to Compu-Link, nor by either of the parties." (Dec. 21, 2009 JE, Doc. No. 108). By doing so, the trial court's award essentially offset the marital asset of the CompuLink Financial loans by the marital debt of WHFL's loan obligations. The trial court's award is also equitable in light of the fact that it awarded CompuLink Services, L.L.C. to Jerry free of any claim from Marilyn. (Id.). Under these circumstances, we cannot find that the trial court abused its discretion as Jerry argues.

{¶10} Jerry's first assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO CONSIDER THE ACCRUED PENSION OF APPELLEE MARILYN KINDIG.**

{¶11} In his second assignment of error, Jerry argues that "the trial court was obligated to examine the accrued pension, ascertain the value, and consider it in the distribution of marital property." (Appellant's Brief at 17). Marilyn, on the other hand, argues that the trial court did not err by failing to divide her accrued pension, since there was no testimony regarding her portion of the accrued pension benefit. Marilyn further asserts that the monies were not a marital asset, but a mere expectancy, since they were never, in fact, deposited into the pension fund.

{¶12} It is well established that "[a] vested pension plan accumulated during marriage is a marital asset and *must* be considered * * * in dividing marital assets and liabilities to ensure that the result reached is equitable." *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 541 N.E.2d 597, syllabus (emphasis added). See, also, *Wilson v. Wilson*, 116 Ohio St.3d 268, 2007-Ohio-6056, 878 N.E.2d 16, ¶5, citing *Hoyt v. Hoyt* (1990), 53 Ohio St.3d 177, 178-79, 559 N.E.2d 1292; R.C. 3105.18(C)(1)(d). A trial court *may* also consider the value of an *un*vested pension plan as a marital asset for purposes reaching an equitable distribution. *Lemon v. Lemon* (1988), 42 Ohio App.3d 142, 144, 537 N.E.2d 246. "In determining whether an *un*vested pension plan is a marital asset, and in determining its value as an asset, the court should take into consideration the time left before the pension becomes vested, the length of the marriage, and the contributions of both parties to the pension plan." *Holmes v. Holmes*, 5th Dist. No. 09 CA 0017, 2009-Ohio-5720, ¶64, citing *Lemon*, 42 Ohio App.3d at 144. The trial court's decision whether to consider the value of an unvested pension plan as a marital asset will not be disturbed absent an abuse of discretion. *Wilson v. Wilson*, 9th Dist. No. 05CA0078, 2008-Ohio-3195, ¶7.

{¶13} The evidence regarding Marilyn's purported pension from WHFL was limited. Mr. Sielschott, testified as follows:

Q: * * * do you see the entry under the liabilities portion of [Plaintiff's Exhibit number Nine]? I…it's actually the last one, um, denominated accrued pension.
A: Accrued pension, yes, that's correct.
Q: And what is the amount of that?
A: Sixty-four thousand four hundred and thirty dol…uh, twenty nine dollars and seventy cents.
Q: And could you explain to me and the Court what you mean by…or what your accounting firm means by accrued pension?
A: Accrued pension is the amount of money that can be accrued, even for a cash basis, tax payer, um, that they can deduct and intend to fund into the pension and profit sharing plans.
Q: Is there any time limitation as to when those need to be contributed? Would it be…
A: Yes, due date of the return including extension.
Q: Okay. So for the tax years period, it could be pending in this account, is that correct?
A: That's correct.
Q: Okay. And is any of that accrued pension, Doctor Kindig's pension?
A: Oh, I'm sure it would be.
Q: Do you have any idea what proportionate share that would be?
A: Uh, only…it would be to the proportion up to the limits of earnings, which she was well below the limits of earnings in two…in 2007. That her proportion was…
Q: You mean the industry standards of the limits of…
A: No. No. Her…her actual earnings to the other participants who are non-owners. So, *if* she got…*if* she…if you took the total payroll and she was thirty-five percent of that, then she'd get thirty-five percent of the fund.
Q: Wasn't she in fact paid the highest amount of anybody in the office?
A: I would *assume*. She was…she was the physician and the owner, so *I would assume so*.

(Aug. 24, 2009 Tr. at 194-96) (emphasis added). WHFL's 2005 balance sheet lists

$45,311.96 as a liability for "Accrued Pension," and WHFL's 2005 profit and loss

sheet lists this same amount as an expense for "Pension and Profit Sharing." (P's Exs. 15-16). WHFL's 2006 profit and loss sheet lists $43,435.59 as an expense for "Pension & Profit Sharing," but no corresponding liability is found on WHFL's 2006 balance sheet. (P's Exs. 13-14). WHFL's 2007 balance sheet listed $34,868.01 as a liability for "Accrued Pension," while WHFL's 2007 profit and loss sheet lists $35,551.01 as an expense for "Pension & Profit Sharing." (P's Exs. 11-12). WHFL's 2008 balance sheet listed $64,429.70 as a liability for "Accrued Pension" as of August 2008, and WHFL's 2008 profit and loss sheet lists $35,448.17 as an expense for "Pension and Profit Sharing" as of August 2008. (P's Ex. 9-10). None of these documents, however, demonstrate Marilyn's proportion of the WHFL pension fund.

{¶14} Based upon this evidence, we cannot conclude that the trial court abused its discretion by failing to consider Marilyn's WHFL pension. To begin with, it is unclear whether the funds listed on the balance sheets for "Accrued Pension" were ever actually deposited into a pension fund such that the fund could be considered an *un*vested pension fund. Furthermore, it is unclear whether the accrued pension listed on WHFL's 2005-2008 balance sheets represented amounts of accrued pension for each year, or whether WHFL's 2008 balance sheet listed the accrued pension benefits for years 2005 through 2008. *Even if* this Court were to assume that the funds were deposited into a pension fund, it is still unclear what

percentage of those funds belonged to Marilyn as opposed to other employees at WHFL.  It is also uncertain how long it will take for Marilyn's pension benefit to become vested. *Holmes*, 2009-Ohio-5720, at ¶64, citing *Lemon*, 42 Ohio App.3d at 144.  Ultimately, it was Jerry's responsibility to present evidence on these issues, and he has waived this argument on appeal by failing to present such evidence. *Dindal v. Dindal*, 3d Dist. No. 5-09-06, 2009-Ohio-3528, ¶¶9-13.  We also note that the trial court *did* equally divide the parties' three other IRAs. (Jan. 15, 2010 JE, Doc. No. 110); (D's Exs. N-P).  Given the lack of evidence on *Marilyn*'s purported WHFL pension, we cannot find that the trial court abused its discretion by not considering it as Jerry argues.

**{¶15}** Jerry's second assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IGNORING TESTIMONY RELATING TO THE VALUE OF DOCTOR'S LASER CENTERS, LLC AND BY FAILING TO ACCOUNT FOR SUCH VALUE IN THE DISTRIBUTION OF MARITAL ASSETS.**

**{¶16}** In his third assignment of error, Jerry argues that the trial court erred by failing to consider the value of Doctor's Laser Centers in the distribution of the marital assets.  Marilyn, on the other hand, argues that Doctor's Laser Centers had no other value than the value of its medical laser, which the trial court ordered to be sold and the proceeds divided equally between the parties.

{¶17} At the hearing, Jerry testified that about Doctor's Laser Center as follows:

> **Q:** * * * what is Doctor's Laser Center, LLC?
> **A:** It's an LLC formed so that Doctor Kindig could take the medical laser to other sites and perform those services. Specifically…uh, initially it was in Findlay. It was envisioned that that particular piece of equipment would go into family practices, uh, other medical locations, and wouldn't always necessarily be Doctor Kindig. It could have been other providers of those services. So that was the intent of Doctor's Laser Center, was to provide those services.
> **Q:** What are the assets of …so the laser itself is not an asset of Doctor's Laser Center, is that correct?
> **A:** No, that…that lease…the asset is Compulink Financial, the lease is with Women's Health for Life, they have an option to sublease if they choose to. Um, it's not a part of Doctor's Laser Center, LLC at all.
> **Q:** So that's what…is that what has happened there? Is there in fact a sublease agreement between Women's Health and Doctor's Laser, or not?
> **A:** I don't know. I didn't never prepare one.
> **Q:** Okay. What are the other assets, other than the one's you've discussed, of Doctor's Laser Center?
> **A:** Doctor's Laser Center had a checking account. It might have had a savings account. Um, it had marketing materials, brochures. It had a website. Uh, it had video advertisements that were going at the site in Findlay. Uh, there were various other assets.

(Aug. 24, 2009 Tr. at 103-04). Jerry further testified that the value of Doctor's Laser Center was not included in either of the experts' opinions concerning the value of WHFL. (Id. at 104). Jerry testified that in 2007 Doctor's Laser Center grossed $12,605 in sales, with a net profit of $11,835. (Id. at 105); (Joint Ex. 7). Jerry testified that in 2008 Doctor's Laser Center grossed $41,101 in sales and had

ordinary business income of $39,376. (Aug. 24, 2009 Tr. at 105); (Joint Ex. 5).

Sielschott, on the other hand, testified:

> **Q: * * * Did uh…you ever heard of an entity known as Doctor's Laser Center, LLC?**
> **A: Yes.**
> **Q: Okay. Um, was that uh, in the uh, work that you did regarding Women's Health for Life, was that essentially rolled into uh, Women's Health for Life for tax purposes and other purposes?**
> **A: Well, Doctor's Laser Center I did not do the…the accounting and tax work for.**
> **Q: Okay.**
> **A: Mr. Kindig had always done that. Uh, beginning in…in…we got a notice from the IRS, from Doctor Kindig, that the '07 and '08 returns had not been filed. Uh, so we uh, obtained…we tried to obtain a copy of this '06 and couldn't do so, so we contacted the IRS and they gave us a copy. And from the '06 we were able to take the related party revenue and expenses from Doctor Kindig's records and do and '07 and an '08. Um, once those were done, we eliminated the need to repetitively do a…a uh, return for that um…for that entity because it was always my understanding that the reason they started that entity was a mechanical need to have an entity for the laser activity for purposes of…of taking uh, credit cards. And that simply wasn't necessary. *Um, so basically, it doesn't exist. We…we've um…for tax purposes, we've gotten rid of it and that activity now just goes to the practice with all the other revenue.***
> **Q: Okay. Is…is there any independent value that…to Doctor's Laser Center, LLC?**
> **A: There…there may be some value, I suppose to the machine itself. I don't know…**
> **Q: The credit card machine?**
> **\* \* \***
> **A: The laser.**
> **Q: Oh, okay.**
> **A: *But I…but as far as an entity value, I don't see…I don't see why there would be value to that, no.***

(Aug. 24, 2009 Tr. at 177-79) (emphasis added). Marilyn testified that, because of the current economic climate, the medical laser represented only one to two percent (1-2%) of the total work performed at WHFL. (Aug. 24, 2009 Tr. at 197).

{¶18} The trial court found that Doctor's Laser Center, L.L.C. no longer existed and that the laser was of decreased value to WHFL. (Dec. 21, 2009 JE, Doc. No. 108). The evidence above supports the trial court's findings in this regard. The record also demonstrates competent, credible evidence upon which the trial court could conclude that Doctor's Laser Center did not have an independent value. In fact, the trial court ordered that Jerry secure a purchaser for the medical laser and the sale proceeds be divided equally between the parties. (Dec. 21, 2009 JE, Doc. No. 108); (Jan. 15, 2010 JE, Doc. No. 110). We find no abuse of discretion in the trial court's order to sell the medical laser since the funds used by CompuLink to purchase the medical laser were marital funds. Since the record contained competent, credible evidence to support the trial court's findings, it did not abuse its discretion by failing to assign an independent value to Doctor's Laser Center.

{¶19} Jerry's third assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DISREGARDING THE STIPULATION AS TO THE**

**TRANSFER OF TIME FOR THE CHILDREN DURING SUMMER VISITATION.**

{¶20} In his fourth assignment of error, Jerry argues that the trial court erred by failing to incorporate the parties' agreement on the transfer of time for the children during summer visitation. Specifically, Jerry argues that the trial court incorrectly ordered that: "[d]uring Summer weekend visitation Father shall have the children from 5:00 p.m. on Friday *until Mother is finished working on Monday*" when the parties agreed and the court approved that the children would stay with Jerry until 5:00 p.m. on Monday. Marilyn essentially concedes the trial court's error, but argues that this *de minimis* error should not be grounds for a reversal.

{¶21} The following dialogue occurred at the April 16, 2009 hearing during the recitation of the parties' agreement with regard to the allocation of parental rights and responsibilities:

> **MR. FITZGERALD: * * * additionally, on the summer visit…on the summer parenting time for Mr. Kindig, on Monday we said that the children would be with Plaintiff, Mr. Kindig, until the Defendant's off of work. No disrespect to the parties, I want a defined time. Whether it's five p.m., or four p.m., or six p.m. I think we need to pick a…a specific time. And the reason I say that is because, uh, I'm…I'm going to recommend to the Court that whoever is the receiving party is, is the one who picks the kids up uh, for that time. * * ***
> **THE COURT: I…I think a time would be appropriate as well.**
> **MR. HUFFMAN: Five…five o'clock is fine, Judge.**
> **THE COURT: Five o'clock? Five o'clock.**
> **MR. FITZGERALD: That way everyone is protected.**

> **THE COURT: Very good. Five p.m. That…that's…that's a good suggestion.**

(Apr. 16, 2009 Tr. at 134-35). Based on the foregoing, it is clear that the parties reached an agreement that Mr. Kindig would have the children on the weekends during the summer until 5:00 p.m. on Monday. It is also clear that the trial court agreed with having a set time and approved of the parties' agreement to 5:00 p.m., but the trial court's judgment entry mistakenly contained the old agreement that Mr. Kindig would have the children until Marilyn was finished with work. Therefore, the matter must be remanded for the trial court to correct its judgment entry to accurately reflect the stipulation of the parties, which the trial court, in fact, approved at the hearing. See, e.g., *Vengrow v. Vengrow*, 9th Dist. No. 24907, 2010-Ohio-2568, ¶¶15-18; *Moss v. Watson-Hall*, 8th Dist. No. 91431, 2008-Ohio-4456, ¶¶8-18; *Pridemore v. Pridemore* (June 28, 1991), 6th Dist. No. H-90-54.

{¶22} Jerry's fourth assignment of error is, therefore, sustained.

{¶23} Having found no error prejudicial to the appellant herein in the particulars assigned and argued in assignments of error one, two, and three we affirm the judgment of the trial court. Having found error prejudicial to the appellant herein in the particulars assigned and argued in assignment of error four, we reverse the judgment of the trial court and remand for a correction of its judgment entry of divorce filed January 15, 2010.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**SHAW, J., concurs.**

**/jlr**

**ROGERS, J., concurring in part and dissenting in part.**

{¶24} I concur in the majority's resolution of the fourth assignment of error. However, I must dissent from the disposition of the first, second, and third assignments.

{¶25} The parties to this action created multiple corporations. They may have done so to protect themselves from personal liabilities to third parties, for tax purposes, or for some other more nefarious reason. However, the fact remains that the corporate entities exist and have been essentially ignored by the parties, their counsel, and the court in this divorce action. Those who choose to avail themselves of corporate law to avoid personal liabilities to third parties must then accept the responsibilities and liabilities which that body of law imposes. Had these parties been cited into the general division of a court for some civil liability, they would no doubt scream about piercing the corporate veil and the absence of personal liability. There is no logical reason that the formalities of the corporate structure should be ignored simply because they are engaged in the domestic relations division of a court.

**{¶26}** Domestic relations courts in this state have consistently attempted to create their own body of law which ignores long-established and well-settled rules of corporate and real property law. See *Neville v. Neville*, 3d Dist. No. 9-08-37, 2009-Ohio-3817, ¶¶36-39 (Rogers, J., concurring in part and dissenting in part).

**{¶27}** The Rule of Law is what creates, protects, and guarantees the continued existence of a civilized society. When constitutional law, statutory law, and well-established case law is contorted to *fix* individual situations, rather than being applied firmly and consistently, the Rule of Law is denigrated and eventually destroyed. What then remains is the will of an autocrat which changes from day to day and place to place; and eventually, the destruction of a civilized society is realized.

**{¶28}** While the net financial result to the parties in this case may not change if the requirements of corporate law and accounting are imposed, the next case may see unexpected exploitations.

/jlr