[Cite as *Daniel v. Daniel*, 2012-Ohio-5129.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

CHRISTEN M. DANIEL,

     PLAINTIFF-APPELLANT,          CASE NO.  10-11-09

     v.

SEAN M. DANIEL,                 O P I N I O N

     DEFENDANT-APPELLEE.

Appeal from Mercer County Common Pleas Court
Domestic Relations Division
Trial Court No. 09-DIV-032

**Judgment Affirmed**

**Date of Decision:  November 5, 2012**

APPEARANCES:

    *James A. Tesno*  for Appellant

    *Jeffrey P. Squire*  for Appellee

**PRESTON, J**.

{¶1} Plaintiff-appellant, Christen M. Daniel ("Christen") appeals the judgment of the Mercer County Court of Common Pleas, Domestic Relations Division, granting a divorce from defendant-appellee, Sean M. Daniel ("Sean"). On appeal, Christen contends that the trial court erred by failing to divide certain marital property and debts, specifically part of the student loans obtained by Christen during the marriage and Sean's military retirement benefits. We affirm.

{¶2} Christen and Sean were married on January 21, 1995, and three children were born as issue of the marriage, who were 13, 11, and 7 years old at the time of the divorce hearings. (Tr. at 13). The parties separated for a final time in January or March 2008, and Christen filed a complaint for divorce on June 24, 2009. (*Id*. at 114, 118, 203-204, 215); (Doc. No. 3). A two-day hearing was held before a magistrate on February 8, 2010 and April 19, 2010.

{¶3} Most of the issues pertaining to the divorce were settled between the parties with an agreed entry that was read into the record. (Tr. at 5-12); (Doc. No. 81). There was no real estate to divide, and the parties were to keep any motor vehicles and assets titled in their names, although the records do not indicate that there were any significant assets. A shared parenting plan, with the children spending alternating weeks with each parent, was also entered into by agreement.

The three contested issues were the amount of child support,[1] Christen's student loan debt, and Sean's potential unvested military pension.

{¶4} The trial court heard testimony from Christen, Sean, and Casey Kearns, an assistant financial aid director at Ohio State University. In addition, numerous exhibits were admitted, consisting primarily of financial records such as student loan documents, income tax records from 2005 through 2008, and numerous receipts and credit card statements.

{¶5} The testimony established that Sean and Christen were married on January 21, 1995, and they lived in Texas for two years while Sean was on active duty in the military. (Tr. at 13, 198, 218). In March 1997 after Sean's discharge, Sean and Christen moved to St. Mary's in Auglaize County, Ohio where they purchased a home, and Sean joined the Ohio National Guard. (*Id*. at 190-191, 198, 218).

{¶6} Christen testified that she wanted to become a veterinarian since high school, so they decided she should go to college and veterinary school, and her education would be an investment for the family. (Tr. at 72-73, 86-87, 117). To that end, Christen started attending The Ohio State University's branch campus in

---

[1] The final divorce decree ordered Christen to pay child support of $151.17 per month per child, effective January 25, 2010. (Doc. No. 81). However, Sean was deployed on active duty in September 2010, so Christen's child support obligation was terminated, effective November 17, 2010. (Doc. Nos. 42, 73). On March 1, 2011, the same day the final divorce decree was filed, the trial court entered temporary orders naming Christen as the residential parent of the children, and Sean was ordered to pay child support of $408.86 per month per child to Christen, effective January 1, 2011. (Doc. No. 84). The issue of child support was not raised on appeal.

Lima, Ohio ("OSU Lima") in 1999 after the parties' daughter and son were born in 1996 and 1998, respectively. (*Id*. at 13, 53). The parties' third child, a daughter, was born in 2002. (*Id*. at 13). Christen received her undergraduate degree from OSU Lima in June 2004.[2] (*Id*. at 94).

{¶7} In the fall of 2004, Christen and Sean separated, and Christen and the children moved to Dublin, Ohio where she began paying $875/month in rent, so she could attend veterinary school at OSU's main campus in Columbus. (*Id*. at 39, 134, 198, 218). Christen testified that Sean was not supporting her during this time, and she was paying half of the parties' mortgage and credit card payments. (*Id*. at 109-110). Christen admitted that she had an extra-marital relationship from the fall of 2004 until December 2005, and the man stayed with her and the children twice per week. (*Id*. at 124). Beginning in 2005 until she graduated from veterinary school in June 2008, Christen received $500/month in food stamps and child-care assistance from Franklin County. (*Id*. at 113). Christen also received three to four months of cash assistance from the county during her schooling. (*Id*.).

{¶8} When Christen and the children left in the fall of 2004, Sean remained in the marital home in St. Mary's paying the mortgage and the parties' credit cards, until he sold the home in January or February 2005, quit his job, and moved

---

[2] Christen commuted to OSU Columbus for classes in summer quarter 2003. (Tr. at 79, 85); (P's Ex. 3).

to Dublin to be closer to his children. (*Id*. at 108-110, 199, 208). Sean testified that Christen did not want him living with her and the children in Dublin since "it cramped her social style because she had a boyfriend coming over all the time." (*Id*. at 199, 218-219). Sean also testified that he did not discuss student loans or living expenses with Christen after she moved to Dublin in the fall of 2004. (*Id*. at 200). According to Sean, "* * * our assets were divided. She had her money. I had my money. She didn't want me messing with any of her business, so she used her money for whatever she thought she needed to." (*Id*.). To pay for some of his expenses in Dublin, Sean cashed out IRAs worth $20,000 and obtained a job working for Apex Mortgage Corporation in 2005. (*Id*. at 200-201, 208, 224); (P's Exs. 4, 10). Sean testified that he used some of the IRA money to pay for expenses related to the children when they would stay with him on the weekends in his Dublin apartment. (Tr. at 209). Sean admitted that he did not otherwise support Christen or the children when they lived separately in Dublin. (*Id*. at 229).

{¶9} In July 2005, Sean was redeployed to Texas, and, sometime in December 2005 after Christen's extramarital relationship ended, Sean and Christen reconciled. (*Id*. at 19-20, 111, 201). Christen testified that Sean had an extramarital relationship while he was on deployment in Texas, though she did not testify how long the relationship lasted. (Tr. at 234-235). After the parties reconciled, Sean began sending Christen $1,000/month in support, until September

2006 when Christen requested that he only send $500/month so she would still qualify for government assistance. (*Id*. at 202-203, 220-221, 230-231); (P's Ex. 16). When Sean's deployment ended in December 2006, he moved to Dublin where he lived with Christen and the children. (*Id*. at 114, 118, 203-204, 215). In 2007, Sean cashed out another IRA worth over $18,000 to help pay for bills and living expenses. (*Id*. at 144, 208); (P's Ex. 12). Both Sean and Christen held several part-time jobs in 2007. (P's Ex. 12).

{¶10} In January or March 2008, the parties separated for the final time. (Tr. at 114, 118, 203-204, 215). In April 2008, Christen began a new relationship with Alejandro Tlahuel, the father of her child, who was unborn at the time of the February 8, 2010 hearing. (*Id*. at 13-14, 125-126). Christen received her veterinary degree in June 2008 and moved to Mercer County in July 2008 where she obtained a job earning $60,000/year. (*Id*. at 12-15, 126, 146).

{¶11} Christen currently has well over $225,000 in student loans. (*Id*. at 51); (Ex. 3-1 to 3-3). Christen estimated that $128,453 in student loans were directly attributable to living expenses from 1999 to 2008 for Sean, her, and their children. (Tr. at 47, 104, 116); (P's Ex. 2). Casey Kearns, from the OSU financial aid office, testified that Christen has a total of $186,974 in federal direct loans. (Tr. at 175, 180). These loans include $108,962 that are directly attributable to Christen's education (tuition, books, etc.) and an additional $118,873 that was

attributable to living expenses. (Exhibits 2-4, 14-15); (Tr. at 47, 116, 174-175, 180). After scholarships and grants, the amount remaining on the federal direct loans attributable to Christen's education is $68,101, according to Kearns. (Tr. at 175). Christen testified that she is currently paying $140/month on two student loans, and when two of her other student loans come out of deferment, they will be $399.50 and $655.50 per month. (*Id*. at 147-148).

{¶12} Sean testified that he is currently employed with the National Guard and enrolled as a full-time student at Wright State University in Dayton, Ohio. (*Id*. at 190-191). Sean testified that he did not talk with Christen about taking out student loans for her veterinary school, nor did they discuss how she was spending her student loan money. (*Id*. at 205, 222). Sean testified that Christen originally purchased the parties' Ford Windstar van on a credit card, but he subsequently obtained a loan from Chase Bank, paid off the credit card, and later paid off the vehicle. (*Id*. at 206). Sean did not believe that they used student loan money for the Ford Windstar, but he testified that Christen paid cash for the other two cars she obtained and one of the vehicles was in her boyfriend's name. (*Id*.) Sean testified that he "might" get a military pension due to his National Guard Service *if* he accrues 20 years of qualified service. (*Id*. at 212). At the time of the hearing, Sean had been in the National Guard for 16 years, of which he believed 15 qualified as "good service" towards his retirement. (*Id*. at 212-213, 226). Sean

testified that, a couple years ago, he re-enlisted in the National Guard for six years. (*Id*. at 227). When asked if he would reach his 20 years of service, Sean testified, "[t]hat's what I thought until I seen that paper over there that said I won't get my 20-year letter until several months after my ETS." (*Id*.). Sean did not know the monthly amount of his retirement benefit. (*Id*.). Sean admitted that he was not supporting Christen and the children when he was not deployed, and that Christen was using her student loan money to support their children during that time. (*Id*. at 219-220).

{¶13} On May 26, 2010, the magistrate issued her decision, finding that Christen was to be responsible for 100% of all four of the student loans in her name because "[o]nly she received the benefit of the loans over the years. The loans were used for her personal use only. At times her use of the monies demonstrated financial misconduct." (Doc. No. 54, p. 9, ¶ 2.) The magistrate also found that there were "no retirement benefits to divide" because Sean's retirement benefits had not yet "vested." *(Id*.). Therefore, the magistrate determined Christen was not entitled to receive any of Sean's retirement earned due to his service with the National Guard, if and when he might receive them. Christen was ordered to pay child support in the amount of $151.17 per month per child ($453.51 total) plus the 2% administrative fee. (*Id*. at ¶ 4).

{¶14} Christen timely filed objections and supplemental objections to the magistrate's decision. (Doc. Nos. 55, 62). On June 27, 2010, the trial court overruled Christen's objections and issued its final divorce decree on March 1, 2011, adopting the magistrate's decision and incorporating her findings. (Doc. Nos. 76, 81).

{¶15} On March 28, 2011, Christen filed a notice of appeal. (Doc. No. 86). Christen now appeals the trial court's judgment entry of divorce, raising three assignments of error. We elect to combine Christen's first and second assignments of error for discussion.

### First Assignment of Error

**The trial court erred in failing to divide loans in [Christen's] name used to support [Christen], [Sean] and the parties' children during the marriage.**

### Second Assignment of Error

**The trial court erred in failing to divide the retirement benefits in [Sean's] name which were acquired during the parties' marriage.**

{¶16} In the first assignment of error, Christen asserts that the trial court erred when it failed to apportion part of her student loan debt to Sean. Christen acknowledges that $108,962 of her student loans were directly attributable to her education (tuition, books, etc.) and agrees that she should be entirely responsible for this portion. However, she submits that $128,453 of her loans was used to pay

for family living expenses for Sean, her, and their three children; and therefore, Sean should be responsible for half of this student loan debt.

{¶17} In the second assignment of error, Christen alleges that the trial court erred when it failed to award her any interest in Sean's potential unvested military pension. Specifically, Christen argues that the trial court erred when it concluded that there was no retirement benefit to divide since Sean's pension was unvested.

{¶18} The Ohio Revised Code requires a trial court to "determine what constitutes marital property and what constitutes separate property." R.C. 3105.171(B). The court is then required to "divide the marital and separate property equitably between the spouses[.]" *Id.* The Revised Code further requires that a trial court divide the marital property equally unless an equal division would be inequitable, in which case "the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable." R.C. 3105.171(C)(1).

{¶19} Marital property includes property that is currently owned by either or both spouses and that was acquired by either or both of the spouses during the marriage. See R.C. 3105.171(A)(3)(a). Property acquired during a marriage is presumed to be marital property unless it can be shown to be separate. *Huelskamp v. Huelskamp*, 185 Ohio App.3d 611, 2009-Ohio-6864, ¶ 13 (3d Dist.). The property to be divided in a divorce proceeding includes not only the assets

owned by the parties but also any debts incurred by the parties. *Marrero v. Marrero*, 9th Dist. No. 02CA008057, 2002-Ohio-4862, ¶ 43. Marital debt has been defined as any debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose. *Ketchum v. Ketchum*, 7th Dist. No. 2001 CO 60, 2003-Ohio-2559, ¶ 47, citing Turner, Equitable Distribution of Property (2 Ed.1994, Supp.2002) 455, Section 6.29.

{¶20} Student loans obtained by one spouse during the marriage may be categorized as marital debt subject to equitable distribution of the court. *Harris v. Harris*, 5th Dist. No. 2006-CA-00003, 2007-Ohio-1232, ¶ 34; *Webb v. Webb*, 12th Dist. No. CA97-09-167, *4 (Nov. 30, 1998). Including student loans in the marital estate, however, "in no way forecloses the ability of the trial court to award all of the loans to the spouse who took out the loans." *Id*. A trial court does not abuse its discretion by allocating the student loan debt to the party who incurred the debt and receives the benefit. *Webb* at *4. *See also Vonderhaar-Ketron v. Ketron*, 5th Dist. No. 10 CA 22, 2010-Ohio-6593, ¶ 36 (husband to be responsible for debt from his law school expenditures due to the emergence of the divorce action shortly after he passed the bar exam); *Thill v. Thill*, 2nd Dist. No. 2001-CA-23, *4 (Aug. 17, 2001) (the wife will receive the sole benefit of her degree, since any income she generates will be realized only after the end of the marriage, and no part of the student loan proceeds were used to pay family expenses).

{¶21} Trial courts have "broad discretion to determine what property division is equitable in a divorce proceeding." *Cherry v. Cherry*, 66 Ohio St.2d 348 (1981), paragraph two of the syllabus. A trial court's decision allocating marital property and debt will not be reversed absent an abuse of discretion. *Jackson v. Jackson*, 3d Dist. No. 11-07-11, 2008-Ohio-1482, ¶ 15, citing *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 131 (1989). When applying the abuse of discretion standard of review, an appellate court should not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶22} Upon review of the record, we cannot conclude that the trial court abused its discretion by allocating all of the student loan debt to Christen. To begin with, Christen will incur the direct benefit from her degree, not Sean. *Webb* at *4. Christen accepted a job working as a veterinarian earning $60,000/year immediately upon graduating in June 2008. (Tr. at 12-15, 126, 146). As of 2011, Christen's salary was reportedly $67,500/year. (Doc. No. 84). Sean is now enrolled in college and has incurred his own student loan debt. (Tr. at 190-194). While some of Christen's student loan proceeds were used for living expenses for the children and her, Sean was financially supporting Christen by paying on the marital debts and obligations (mortgage, marital credit cards), by cashing in over $40,000 in IRAs, and by holding several part-time jobs when he was not on active

duty. Beginning in October 2005, while he was redeployed in Texas, Sean was sending Christen around $1,000/month, until September 2006 when Christen asked him to stop sending so much money, so she could continue to receive government assistance[3]. With the exception of the one-year reconciliation period (Dec. 2006 to Jan. 2008), from the fall of 2004 forward the parties were living separate lives; each had extramarital relationships, each had separate residences, separate vehicles, separate insurance, separate bank accounts, and separate credit cards. Even when the parties reconciled and lived together from December 2006 to January 2008, they still maintained separate finances. (Tr. at 144). The only exception to the parties' separate finances is that they filed income taxes jointly from 2005 to 2008. (P's Exs. 10-13).

{¶23} The majority of the Christen's student loan debt was accumulated during her four years of veterinary school when Sean did not have any control over Christen's borrowing or spending.[4] Christen used student loan money to

---

[3] In her 2005 check registry, Christen recorded the following deposits from Sean: $1,225 on 10/3/05; $1,244 on 12/3/05; $850 on 3/8/06; $1,781 on 4/3/06; $950 on 5/3/06; $1,100 on 6/5/06. (P's Ex. 6). She also recorded the following cash deposits from unknown sources: $684 on 1/18/06; $690 on 2/1/06; $754 on 2/12/06; $2,306.98 (for car) on 1/25/06; $50 on 2/10/06; $220 (for car) on 4/17/06; $449.31 on 5/22/06; $1,159 on 6/20/06; $1,000 (ATM deposit in TX) on 7/5/06; $434.13 (ATM Dep.) on 7/10/06; $930 (ATM Dep.) on 8/3/06; $592 on 8/24/06; $500 (Ckg TX) on 8/30/06; $1,150 (Check Tx.) on 9/6/06; $1,100 on 10/2/06. (*Id*.). Sean appears to be the source of several of these unknown deposits since they originated in Texas, where Sean was deployed or were for amounts similar to what Sean had provided in the past (around $1,100/month).

[4] According to OSU financial aid records, the total amount of loans taken out during Christen's undergraduate education, when Sean and Christen lived together as a married couple, was $30,646. (P's Ex. 14). According to Christen's own calculations, the total of her undergraduate loans was $37,131. (P's Ex.

purchase at least two vehicles—one of which was titled in her boyfriend's name. (Tr. at 64, 206) An OSU financial aid office representative testified that purchasing a vehicle would not be considered a qualifying educational expense under federal guidelines. (*Id*. at 169). Christen's bank statements also evidenced financial irresponsibility. Christen spent much of her student loan money purchasing coffee from high-end coffee shops like Starbucks, Caribou, and Cup O'Joe[5]; products and clothes from retailers[6]; I-tunes[7]; tanning sessions/products and massages[8]; arts and crafts[9]; OSU athletic tickets[10]; and other food and entertainment[11]. (2006 Chase Bank & Credit Card Statements, P's Ex. 7). Christen also made several ATM withdrawals for several hundred dollars at a

---

3-1). Christen's total student loan debt for undergraduate and graduate school, both public and private, is over $225,000. (*Id*.).

[5] Referencing all of Christen's coffeehouse purchases would require several pages herein. Suffice it to say that Christen was a loyal customer spending, on average, around $10 each visit. (2006 Chase Bank Statements, P's Ex. 7).

[6] Christen spent at Banana Republic: $290.80 on 3/29/07 (P's Ex. 6); Christen spent at Kohl's: $104.18 on 5/2/06; $110.76 on 7/7/06 (for children's clothes); $491.34 on 12/8/06 (for children's clothes) (P's Ex. 7); Christen spent on Victoria's Secret: $160.77 on 7/27/06, a $20 late fee accrued on this account on 9/13/06; Christen spent over $800 at IKEA on 8/13/06. (*Id*.). Christen spent $181.00 at Maurice's on 1/19/07 (Check Registry, P's Ex. 8).

[7] Christen spent the following amounts on I-tunes: $2.97 on 12/19/06; $0.99 on 4/29/06; $4.95 on 5/2/06; $3.96 on 5/22/06; $9.99 on 5/27/06; $1.98 on 7/12/06; $40.59 on 7/16/06; $1.98 on 7/19/06; $4.95 on 7/22/06; $14.85 on 7/24/06; $0.99 on 8/27/06; $0.99 on 11/16/06; $7.99 on 12/1/06. (P's Ex. 6).

[8] Christen spent the following amounts on tanning: $21.25 on 3/17/06; $104.41 on 6/1/06; $1.07 on 7/8/06; $1.49 on 8/5/06; $42.38 on 8/17/06; $1.49 on 10/10/06; $49.53 on 11/1/06; Christen spent $96.73 for massage(s) on 9/12/06. (P's Ex. 6).

[9] Christen spent the following amounts on arts and crafts: $300 on 5/6/06; $49.37 on 10/17/06 (P's Ex. 6); $34.16 (JoAnne's) on 1/21/07. (P's Ex. 7).

[10] Christen spent $412.00 on OSU athletic tickets on 4/11/06. (Chase Marathon Credit Card Statement, P's Ex. 7)

[11] Christen spent hundreds, if not thousands of dollars, on food and entertainment in 2006; to catalogue all of her expenditures would be a tall task. She also had a Netflix membership, which was $19.20/month. (P's Ex. 7). It also appears that Christen spent $373.70 on airline tickets in July 2006 to visit Sean in Texas. (Chase Marathon Credit Card Statement, P's Ex. 7).

time; it is unclear where this money was spent. (*Id.*). After reviewing all of the financial records, it is clear that Christen was spending more than the typical student on miscellaneous items and services, often incurring late fees for failing to keep up with her credit card bills.[12] All of these expenses were *in addition* to the high living expenses that Christen incurred by choosing to live in Dublin, Ohio, an affluent suburb of Columbus.

{¶24} In light of the foregoing, the magistrate concluded that Christen's use of her student loan proceeds amounted to financial misconduct. R.C. 3105.171(E)(4) provides: "[i]f a spouse has engaged in financial misconduct * * * the court may compensate the offended spouse with a distributive award or with a greater award of marital property." "Before a compensating award is made, however, there must be a clear showing that the offending spouse either profited from the alleged misconduct or intentionally defeated the other spouse's distribution of assets." *Eggeman v. Eggeman*, 3d Dist. No. 2-04-06, 2004-Ohio-6050, ¶ 24, citing *Wideman v. Wideman*, 6th Dist. No. WD-02-30, 2003-Ohio-1858, ¶ 34; *Detlef v. Detlef*, 6th Dist. No. L-00-1137 (Dec. 14, 2001). The record fails to demonstrate that Christen engaged in financial misconduct since she did not profit or intentionally defeat Sean's distribution of assets. Nevertheless, while

---

[12] Our listing of Christen's 2006 expenditures in footnotes 5-11 illustrates the types and amounts of money Christen was spending from 2006 through 2008 while she was attending veterinary school and borrowing thousands upon thousands of dollars. Our list is not meant to be exhaustive but illustrative.

the trial court incorrectly concluded that Christen engaged in financial misconduct under R.C. 3105.171(E)(4), the trial court was free to consider Christen's financial irresponsibility to equitably divide Christen's student loan debt. R.C. 3105.171(F)(10). It is clear that the magistrate weighed this factor heavily when she apportioned all of the student loan debt to Christen. We cannot find that the trial court abused its discretion by making Christen responsible for 100% of her student loan debt in light of the parties' marital relationship, the contributions of both parties during the marriage for living expenses, and Christen's financial irresponsibility during her four years in veterinary school, which is where the majority of Christen's loan debt accumulated. The trial court could have concluded within its discretion that it was inequitable for Sean to pay half of Christen's living expenses when he was not involved in any of the financial decisions, especially in light of Christen's high level of discretionary spending.

### *Potential Military Pension*

{¶25} In her second assignment of error, Christen argues that the trial court abused its discretion by failing to apportion her any interest in Sean's unvested military pension. Specifically, Christen argues that the trial court erroneously concluded that it could not divide the pension since it was unvested. Christen also argues that the trial court's decision was inequitable since Sean earned sixteen of the twenty years he needs to qualify for a military pension during the marriage.

{¶26} It is well established that "[a] vested pension plan accumulated during marriage is a marital asset and must be considered * * * in dividing marital assets and liabilities to ensure that the result reached is equitable." *Holcomb*, 44 Ohio St.3d 128, at syllabus. *See also Wilson v. Wilson*, 116 Ohio St.3d 268, 2007-Ohio-6056, ¶ 5, citing *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 178-179 (1990); R.C. 3105.18(C)(1)(d). A trial court may also consider the value of an unvested pension plan as a marital asset for purposes reaching an equitable distribution. *Lemon v. Lemon*, 42 Ohio App.3d 142, 144 (4th Dist.1988). "In determining whether an unvested pension plan is a marital asset, and in determining its value as an asset, the court should take into consideration the time left before the pension becomes vested, the length of the marriage, and the contributions of both parties to the pension plan." *Holmes v. Holmes*, 5th Dist. No. 09 CA 0017, 2009-Ohio-5720, ¶ 64, citing *Lemon*, 42 Ohio App.3d at 144. The trial court's decision whether to consider the value of an unvested pension plan as a marital asset will not be disturbed absent an abuse of discretion. *Wilson v. Wilson*, 9th Dist. No. 05CA0078, 2008-Ohio-3195, ¶ 7. *See also Kindig v. Kindig*, 3d Dist. No. 1-10-13, 2010-Ohio-4805, ¶ 12; *Pruitt v. Pruitt*, 8th Dist. No. 84335, 2005-Ohio-4424, ¶ 61; *Haller v. Haller*, 12th Dist. No. CA95-06-063, *2 (Mar. 18, 1996).

{¶27} A *vested* military pension may be included in the marital estate, where appropriate, and considered in the equitable division of property. *Teeter v.*

*Teeter*, 18 Ohio St.3d 76, 77 (1985) (per curiam); *Mackey v. Mackey*, 95 Ohio St.3d 396, 2002-Ohio-2429, ¶ 9; *Hasselback v. Hasselback*, 10th Dist. No. 06AP-776, 2007-Ohio-762; *Baker v. Baker*, 3d Dist. No 13-95-36, *2 (Jan. 19, 1996). Whether an *unvested* military pension may be considered in the equitable division of property is currently in debate. *Compare Siler v. Siler*, 12th Dist. No. CA93-10-081, *1 (July 25, 1994) (per curiam) ("yes"), overruling *King v. King*, 78 Ohio App.3d 599 (12th Dist.1992) ("no") and *Collins v. Collins*, 139 Ohio App.3d 900, 907 (2d Dist.2000) (Grady, P.J., dissenting) ("no"). Of course the parties are always permitted to resolve this issue by agreement. *Ingalls v. Ingalls*, 88 Ohio App.3d 570 (8th Dist.1993) (affirming division of non-vested military retirement benefits consistent with the parties' agreement); *Cherry v. Figart*, 86 Ohio App.3d 123, 127 (12th Dist.1993) (same).

**{¶28}** We need not decide whether or not a trial court erred by failing to consider Sean's unvested military pension given the record in this case, however. As we have stated on a number of occasions, "[a] judgment by the trial court which is correct, but for a different reason, will be affirmed on appeal as there is no prejudice to the appellant." *Bonner v. Bonner*, 3d Dist. No. 14-05-26, 2005-Ohio-6173, ¶ 18, citing *Lust v. Lust*, 3d Dist. No. 16-02-04, 2002-Ohio-3629, ¶ 32, citing *Smith v. Flesher*, 12 Ohio St.2d 107, 110 (1967).

{¶29} In *Kindig v. Kindig*, this Court concluded that the trial court did not abuse its discretion by failing to divide an unvested pension since it was unclear from the record what, if any, funds were deposited into the pension fund, when the pension would vest, and what portion of the pension fund belonged to the spouse as opposed to her employees. 2010-Ohio-4805, at ¶ 14. Like the trial court record in *Kindig*, the record concerning Sean's pension in this case was minimal. While Sean initially testified that he had 16 years of credit toward the 20 years of service he needed to qualify for a military pension, he subsequently indicated that he may only have 15 years. It is also unclear from the record whether or not Sean's pension was based upon years of service, points earned during his years of service, or a combination of the two. Proffered exhibit 17 shows that Sean earned a total of 2,485 points during his military service; however, the exhibit does not reflect how many points (or what kinds of points) Sean must earn to qualify for a retirement benefit. It is also unclear whether or not a certain number of points are required for any year of service to qualify as "good service" towards retirement. No testimony was offered to explain the contents of proffered exhibit 17. In light of this limited record, we cannot conclude that the trial court abused its discretion by failing to divide Sean's unvested military pension.

{¶30} Furthermore, we are not persuaded that the trial court has committed a gross inequity here by failing to give Christen a portion of Sean's pension.

Although the parties were not officially divorced until March 1, 2011, they lived essentially separate lives since the fall of 2004. Consequently, Christen was not with Sean during all 15 or 16 years of military service, and, additionally, Sean also began his military career a year prior to the marriage. Beyond that, Sean cashed out multiple IRAs in his name during the marriage to pay for the parties living expenses, and Christen is now paying into her own retirement. Therefore, we cannot find the trial court abused its discretion by not dividing Sean's potential unvested military pension.

{¶31} Christen's first and second assignments of error are, therefore, overruled.

### Third Assignment of Error

**The trial court erred in refusing to grant [Christen] a continuance upon showing that a material witness had knowledge of an issued subpoena but failed to appear.**

{¶32} In the third assignment of error, Christen claims that the trial court abused its discretion when it failed to grant a continuance due to a subpoenaed witness' failure to appear.

{¶33} It has long been established that "'[t]he grant or denial of a continuance is a matter [that] is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.'" *State v. Jones*, 91 Ohio St.3d 335, 342

-20-

(2001), quoting *State v. Unger*, 67 Ohio St.2d 65 (1981), syllabus. Factors to be considered can include the length of the continuance requested, any prior continuance, inconvenience, reasons for the delay, whether the defendant contributed to the delay, and other relevant factors. *State v. Landrum*, 53 Ohio St.3d 107, 115 (1990).

{¶34} On April 6, 2010, Christen issued a subpoena duces tecum for Sean's commanding officer to appear and bring records of Sean's retirement benefits, including dates for which credits were earned; leave and earnings statements from 2007 to the present; records of family allowances paid to Sean; and, records of payments to Sean under the GI Bill or Ohio National Guard Tuition reimbursement programs. (Doc. No. 48). The commanding officer did not appear, and no motion to quash was filed. It appeared that the commander was aware of the subpoena and that he had been served, but the court had not yet received a return on the subpoena as of the final hearing.[13] In fact, the commander had told court staff that he could not attend the hearing, and the materials requested were federal documents not within his possession or control. (Tr. at 245-246).

{¶35} The trial court denied the motion for a continuance, but it did allow Christen's attorney to proffer several documents expected to be the subject of the

---

[13] It was later discovered that the subpoena had been served on April 8, 2010, and that proof of service of the subpoena was filed with the Clerk on the day of the final hearing. (Doc. No. 50).

commanding officer's testimony. Proffered Exhibits #17 and #18 consisted of Sean's National Guard retirement points history statement, payroll records, projected retirement eligibility, and an April 16, 2010 letter to Christen's attorney (with a copy to Sean's attorney and the court) from the Ohio Adjutant General's Department, explaining why the commander would be unable to supply the documents requested in the subpoena duces tecum.

{¶36} The trial court found that the subpoena should have been issued sooner, stating that Christen's attorney should not have waited until two weeks before the final hearing to subpoena documents. (Tr. at 252). The trial court indicated that the recipient was not given enough time to file a motion to quash, and further stated that the requested documents were "discovery," and "[t]he more appropriate method would have been to have a deposition. You could have found out all this information, but we shouldn't be doing discovery at the second day of the final hearing." (*Id.*). Furthermore, the letter from the Adjutant General's Department stated that "[t]he production of Federal documents and appearance of government personnel as witnesses in private litigation is governed by regulations promulgated by the Department of Defense * * * found at 32 CFR Part 97" and those regulations must be complied with before testimony by Ohio National Guard personnel would be permitted. (Proffered Exhibit #18.) The letter further

explained where some of the information might be found and also stated that most of the information could have been obtained directly from Sean. (*Id.*)

{¶37} Based on the above, we do not find that the trial court's denial of a continuance was an abuse of discretion. It does not appear that the commander had access to the information requested, and the information was readily available through alternative channels. Furthermore, the hearing had already been continued from February 8, 2010 until April 19, 2010 to finish the hearing, and counsel for Christen could have taken steps during that time to secure the necessary witness and documents for the hearing. Under these circumstances, we cannot conclude that the trial court abused its discretion by denying Christen's motion for a continuance.

{¶38} Christen's third assignment of error is, therefore, overruled.

{¶39} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J, concurs.**
**/jlr**

**WILLAMOWSKI, J., Concurs in Part and Dissents in Part.**

{¶40} While I concur with the majority regarding the third assignment of error, I respectfully dissent from the majority opinion as to the first and second

assignments of error. It is true that a trial court has considerable discretion in the division of assets and liabilities in a divorce. However, it is an abuse of discretion when a trial court's findings are contradicted by the undisputed facts in the record and when it misstates and misconstrues the law.

{¶41} Furthermore, the trial court's characterization of property and debt as separate or marital is a mixed question of law and fact, which must be supported by sufficient credible evidence. *Kelly v. Kelly*, 111 Ohio App.3d 641, 642 (1st Dist.1996). Although appellate courts review a trial court's division of property under an abuse of discretion standard, a trial court's classification of property as marital or separate must be supported by the manifest weight of the evidence. *Henry v. Henry*, 3d Dist. No. 8-11-04, 2012-Ohio-655, ¶ 31. When we consider manifest weight arguments, we "review the evidence, and * * * determine whether, when appropriate deference is given to the factual conclusion of the trial court, the evidence persuades us by the requisite burden of proof." *Henderson v. Henderson,* 3d Dist. No. 10-01-17, 2002-Ohio-2720, ¶ 28.

*First Assignment of Error -- Division of Student Loan Debt*

{¶42} The trial court failed to characterize the assets and debts before dividing them, so it is impossible for this Court to determine what standard of review is applicable. From the language of the trial court's decision, it appears that it considered the entire student loan debt to be Christen's separate debt.

-24-

> Each party shall pay any student loan debt incurred in their own name and shall hold the other party harmless. [Christen] shall pay all four of her student loans. *Only she received benefit of the loans over the years. The loans were used for her personal use only*.

(Emphasis added) (Mag. Dec., p. 9, ¶ 2) However, the evidence unequivocally demonstrated that Christen used monies she received from the student loans to pay for housing, transportation, and living expenses for herself and for their three children. This would clearly make a portion of the loans a marital debt. Christen was not asking to be reimbursed for the portion of the debt that was attributable to obtaining her education (tuition, books and fees) – she was only asking that Sean help pay for the portion of the student loans that was used for marital and household living expenses that was used for the support of the family while she was a student.

{¶43} Debts incurred during the marriage are presumed to be marital unless it can be proved that they are not. *Vergitz v. Vergitz*, 7th Dist. No. 05JE52, 2007–Ohio–1395, ¶ 12, citing *Knox v. Knox*, 7th Dist. No. 04JE24, 2006–Ohio–1154, ¶ 25–26. The party seeking to establish a debt is separate rather than marital bears the burden of proving this to the trial court by a preponderance of the evidence. *Id*., citing *Hurte v. Hurte*, 164 Ohio App.3d 446, 2005–Ohio–5967, ¶ 21 (4th Dist.); *Lucas v. Lucas,* 7th Dist. No. 11 NO 382, 2011-Ohio-6411, ¶ 33; *Kranz v. Kranz*, 12th Dist. No. CA2008-04-054, 2009-Ohio-2451, ¶ 24. It is widely

acknowledged that "[s]tudent loans are often taken out not only to pay for school, but also to provide additional financial resources while the one spouse is pursuing an education" *See, e.g., Webb v. Webb*, 12th Dist. No. CA97-09-167, 1998 WL 820838.

{¶44} All of Christen's student loan debts were taken out during the marriage, with Sean's knowledge and approval, and should be presumed to be marital debt. *See, e.g., Vergitz*, 2007–Ohio–1395, ¶ 12-13; *Ketchum v. Ketchum*, 7th Dist. No.2001 CO60, 2003–Ohio–2559, ¶ 47; *Webb v. Webb*, 12th Dist. No. CA97-09-167, 1998 WL 820838. Christen provided testimony and numerous records documenting expenses that were paid over the years *that were used for living expenses for her, for Sean, and the children.* The trial court's conclusion that "[t]he loans were used for her personal use only" is completely contradicted by the facts and evidence in the record. Her records showed expenditures for items such as: car repair; daycare; preschool expenses; latchkey child expenses; computer repair; doctor's bills; utility bills; rent payments; gymnastic lessons; wrestling for Isaac; violin for Sarah; H&R Block tax filing fees; gasoline; phone bills; renter's insurance; school supplies; clothing; children's shoes; Netflix; groceries; prescription medicines; life insurance; dental bills; hospital bills; water and sewer fees; McDonald's; Meijer's; Wal-Mart; parking; etc. The exhibits submitted as evidence demonstrated that Christen used the student loan money she

received to pay for the typical living expenses that most families pay. (Plaintiff's Exhibits 4 through 9) *See Day v. Day*, 5th Dist. No. 04 COA 74, 2005-Ohio-4343 (the trial court erred when it determined that only the wife should be responsible for the student loan debt because only she derived a benefit from the degrees, when the evidence demonstrated that some of the money was used to pay transportation and day care expenses).

{¶45} Furthermore, the Magistrate indicated that she felt Christen failed to prove that the expenditures were family expenses. However, *the burden was upon Sean to prove that they were Christen's separate debt, and were not used for marital/family expenditures.* Not only did Sean fail to do this, but his testimony confirmed that Christen needed to utilize the loan money to support herself and the children during the marriage:

> Q. During that time [when Christen was in veterinary school] were you giving Chris money to help raise the kids, support the kids, pay for their room and board?
>
> A. While I wasn't deployed, no. Like we said earlier, I could barely pay all the bills that I had.
>
> Q. So how do you think she was supporting your children?
>
> A. When she had them, she was using her student loans.
>
> * * *
>
> Q. So she was raising the kids on her own down there [in Dublin] then?

A.   I would get them on weekends to help.

Q.   You weren't providing any financial support for your family down there, correct?

A.   Correct.

**{¶46}** Although the trial court repeatedly stated that Christen was receiving a "family allowance" during part of the year that Sean was deployed in Texas, Sean testified that he was only sending $500 to a $1,000 a month.  This was not likely to be enough to support Christen and three children, thereby necessitating that Christen rely on her student loan monies and some public assistance.  The finding of fact that "[t]he loans were used for her personal use only" was clearly contrary to the evidence in the record.  (*See* Mag. Dec., p. 9, ¶ 2)

**{¶47}** Another rationale that was provided for assigning the entire student loan burden to Christen was that the magistrate found that "[a]t times [Christen's] use of the monies demonstrated financial misconduct."  (Magistrate's Dec., p. 9) The magistrate found that Christen's spending was "beyond what a 'typical-starving college student' would spend."  (*Id.* at p. 4)  In reviewing the credit card bills and statements that Christen provided, the magistrate found fault with the fact that that there were:  "multiple charges for Starbucks and other high-end coffee shops," charges for "items purchased at IKEA," "excessive charges for fast food," tickets for OSU athletic events, and multiple $39 late fee charges.  (*Id.* at p. 5)

**{¶48}** The examples of "financial misconduct" in relevant case law, i.e., "dissipation, destruction, concealment, or fraudulent disposition of assets," does not bear any resemblance to what the magistrate has labeled "financial misconduct" in this case. *See, e.g.*, *Smith v. Emery-Smith*, 190 Ohio App.3d 335, 2010-Ohio-5302 (12th Dist.) (wife engaged in financial misconduct with respect to husband's stock certificates, where wife sold stock that husband had inherited without his authorization while he was in a treatment facility); *Brent v. Brent*, 5th Dist. No. 05-CA-85, 2006-Ohio-1960 (husband committed financial misconduct due to a serious gambling habit, which resulted in dissipation of the parties' joint savings account, encumbrance of a vehicle, and a large credit card debt). Contrary to the trial court's findings, there was no evidence that Christen engaged in financial misconduct during the marriage.

**{¶49}** Courts would indeed be going down a slippery slope if the division of debts and assets depended upon a trial court's subjective analysis of whether or not a party to a divorce had lived a sufficiently frugal lifestyle during the marriage. Should a divorcing wife be responsible for all of a family's credit card debt if it was determined that she purchased the children's clothes at Neiman Marcus or Macy's rather than Target or Wal-Mart? Or, does a "starving student" budget require purchases be made at a thrift store or Goodwill? What constitutes

"excessive" fast food purchases? How many times per week is it permissible to order a pizza?

**{¶50}** And, the magistrate completely misunderstood or misconstrued the testimony of Casey Kearns, the Senior Assistant Director from Ohio State's Office of Student Financial Aid in determining that Christen's use of student loan money for family expenses and to purchase a vehicle (which was used for transportation for her and the children) was improper. When asked whether or not it was typical for students to use a portion of their loans "for living expenses for the family and the household," Mr. Kearns replied, "[t]hat happens all the time." (Tr., p. 169) In fact, he testified that the formulas used to determine financial aid included "things like rent, groceries * * * laundry" and an entire "miscellaneous" category for "things like transportation, health insurance, clothing, and personal expenses * * *." As to the purchase of a car, Mr. Kearns stated that buying a car is not a qualified educational expense "in its entirety," but that *the cost of transportation is included as a qualified expense* "because you need to get to and from school." There is no prohibition against purchasing a car; students may spend that money as needed to provide necessary transportation. (*Id.*) Although Sean contributed some money to the family's expenses, his income varied greatly from year to year, necessitating that the parties utilize Christen's loan monies to pay normal family living expenses. (Pl. Ex. 2)

**{¶51}** The trial court also repeatedly stated that the parties were separated or living apart at various times. However, the testimony shows that their period of actual separation from the time they were married in January 1995, until their final separation in March or June 2008, was a relatively small period of time. The parties were separated from the fall of 2004 (when Christen went to Dublin for veterinary school) through Sean's deployment in July of 2005. (Tr. p. 111) However the testimony of both parties confirmed that they reconciled during his deployment and visited each other when they could, and were reconciled when his deployment ended in December of 2006, until their final separation in 2008. (*Id.*)

**{¶52}** The Magistrate's decision is replete with commentary and conclusions that were not supported by the record, and are actually contradicted by the record. While it is true that Christen and Sean may not have had the most traditional type of living arrangements during their marriage, or at least during the last few years, the evidence clearly demonstrates that a portion of the money Christen received from her student loans was used for her support and the support of their children. Therefore, those expenses constituted a marital debt that should be been equitably divided upon their divorce. While an equitable division does not necessarily mean that the division should have been equal, especially in light of some of the unique circumstances of this case, holding Christen responsible for one-hundred percent of the debt was contrary to the evidence and an inequitable

abuse of discretion. Therefore, I would sustain Christen's first assignment of error.

*Second Assignment of Error – Division of Unvested Military Pension*

**{¶53}** The trial court based its decision to deny Christen any portion of Sean's unvested military pension on its mistaken belief that "Ohio law does not permit the court to divide a non-vested pension benefit." (Mag. Dec., A8, ¶ 52) This is an erroneous misstatement of the law. Therefore, the second assignment of error should be sustained and the matter remanded for an equitable decision in compliance with the law.

**{¶54}** However, in a convoluted effort to try to find some rationale upon which to affirm the trial court's decision, the majority attempts to base its affirmance on this Court's decision in *Kindig v. Kindig*, 3d Dist. No. 1-10-13, 2010-Ohio-4805. Any reliance upon *Kindig* is misplaced because the facts, circumstances, and holding are completely distinguishable from those in this case.

**{¶55}** Sean relied upon *King v. King*, 78 Ohio App.3d 599 (12th Dist.1992) for the proposition that a trial court should not retain jurisdiction to divide an unvested military pension because the potential benefit was far too speculative. However, in a subsequent decision, the Twelfth District Court of Appeals specifically overruled its decision in *King v. King* and held that, although there may be speculation as to whether or not a party's military pension will eventually

-32-

vest, a trial court did not abuse its discretion in considering it to be a marital asset subject to division. *Siler v. Siler*, 12th Dist. No. CA93-10-081, 1994-WL-386106 (Jul. 25, 1994). With facts very similar to those in the case before us today, the Twelfth District Court of Appeals stated:

> The facts in this case indicate that appellant and appellee had been married for fifteen years. During the course of this marriage, appellee was enlisted in the United States Air Force, and appellant was a homemaker caring for the couple's children. * * * This fund will vest in four and one-half years, provided appellee remains in the military. Thus, since the funds in the pension plan accrued during the course of the couple's marriage, appellant should be entitled to a share of the funds once they vest because the fund is marital property. *See Hoyt, supra; Holcomb, supra.*
>
> It is indisputable that appellee may leave the military before the pension vests. If that does occur, then neither he nor appellant will receive money from the pension fund. The fact that appellee would receive no retirement benefits unless he remains in the service for twenty years is a greater incentive to stay in the military than the incentive to leave the military in order to deprive appellant of any of the pension. If appellee does complete the number of years in the military necessary for him to become vested in the pension fund, then appellant should be entitled to a portion of this fund. Accordingly, appellant's assignment of error is sustained. The trial court's decision is reversed, and this cause is remanded in order to allow the trial court to exercise jurisdiction over appellee's military pension.

*Id.* at *1.

{¶56} Therefore, according to existing Ohio law, the trial court erred when it did not take Sean's potential military retirement pension into account when determining a fair and equitable property division. Military pensions earned

during the course of a marriage are marital assets and a factor to be considered in the division of property. *Teeter v. Teeter*, 18 Ohio St.3d 76, 78 (1985). And, even though a pension has not yet vested, it has value that may be considered in a property division. *See Lemon v. Lemon*, 42 Ohio App.3d 142, 144 (4th Dist.1988) and *Siler*, *supra*. Just recently, the Ohio Supreme Court held that a case in which the trial court awarded the spouse "one-half of the coverture value of the plaintiff's *unvested* Teamsters pension, *if and when it becomes vested*," was a final divorce decree, even though the QDRO to implement the property division was not yet able to be completed. (Emphasis added.) *Wilson v. Wilson*, 116 Ohio St.3d 268 (2007).

{¶57} Although Sean's military pension had not *yet* vested, it was potentially only a few years away from vesting and being a significant asset. A majority of the qualified service for Sean's pension was earned *during the marriage*. Therefore, if the pension eventually vests, the portion of the retirement benefit that was attributable to the years during the marriage should be considered marital property and Christen would be entitled to her equitable share.

{¶58} The majority claims that whether an unvested military pension may be considered in the equitable division of property "is currently in debate," citing to a case that was specifically overruled on this point and dicta in a dissent. See ¶ 27 *supra*. Although the Ohio Supreme Court has not yet ruled on this specific

-34-

issue, the current law clearly allows for the consideration of an unvested military pension in the division of assets. *See, Siler v. Siler, supra.* Furthermore, the Ohio Supreme Court has found that other unvested pensions may be considered as a marital asset. *See*, *Wilson, supra.* And, throughout the rest of the country, especially in states that may have more military bases and service members than Ohio, unvested military pensions are typically included in the division of marital assets.

> Although this issue is one of first impression in Colorado, it has been litigated extensively in other jurisdictions. G. Blumberg, "Intangible Assets Recognition and Valuation," 2 J.P. McCahey, ed., Valuation & Distribution of Marital Property. *The majority of other courts have held that a spouse's interest in military retirement benefits is marital property to the extent that such rights accrued during the marriage,* **whether the interest is vested or not vested at the time of dissolution of the marriage**. *See generally* Annot., "Pension or Retirement Benefits as Subject to Award or Division by Court in Settlement of Property Rights Between Spouses," 94 A.L.R.3d 176 (1979).

> The reasoning employed in these cases is as follows. Marital property, subject to division in a dissolution action, consists of that property acquired by either spouse during the marriage (with a few exceptions not pertinent to this analysis). Military retirement benefits are not a mere gratuity derived from an employer's beneficence; rather, they are a form of deferred compensation constituting consideration for past services performed by the employee. * * *

> *Whether the military pension is vested or unvested is immaterial*, since its critical characteristic is the fact that it is based on an employee's efforts. As observed by the Idaho Supreme Court in *Shill v. Shill*, 100 Idaho 433, 599 P.2d 1004 (1979), regarding non-

> military pensions, a pension "is not earned on the last day of the 20th
> year of employment."

(Emphasis added; some internal citations omitted.)  *In re Marriage of Beckman*,

800 P.2d 1376, 1378 -1379 (Colo.App.1990).

{¶59} To hold that a military pension is not a potentially divisible marital

asset would enable a military spouse to finalize a divorce shortly before the

pension vests, thereby preventing his or her spouse from obtaining any rights to

what can be a very significant asset.  In an effort to avoid contradicting existing

case law, in Ohio and most other states, and arriving at such an unfair holding, the

majority instead attempted to rely upon *Kindig* as justification for an affirmance in

order to side-step the issue of finding that the trial court erred when it failed to

consider Sean's unvested military pension as a potential asset subject to an

equitable division.  However, as stated above, *Kindig* is not applicable to the facts

before us.

{¶60} In *Kindig*, we held that the trial court did not abuse its discretion

when it did not consider the wife's unvested pension because it was unclear

whether the funds listed on the balance sheets were ever actually deposited into a

pension fund; whether such a fund actually existed; whether the funds listed on the

balance sheet represented the amounts of the accrued pension; what percentage of

any funds that might have existed belonged to the wife as opposed to other

employees; or how long it would be before any potential pension would vest. *Kindig*, 2010-Ohio-4805, at ¶ 14. In *Kindig*, the divorcing parties had considerable assets and resources. The wife was a physician, and both parties owned multiple businesses, medical practices, profit-sharing plans, and several other IRAs. In *Kindig*, the trial court was attempting to value the parties' multiple assets and liabilities in order to disentangle their affairs and equitably divide their property. We found that the husband failed to provide sufficient evidence as to the existence and value of the wife's alleged pension plan to enable the trial court to consider it in the property division, and therefore, he waived this argument on appeal. *Id.*

{¶61} However, in the case before us now, the potential military pension is the *only* marital asset that the parties may have. Unlike *Kindig*, there was no need to determine a value for the military pension for the purpose of "setting off" its valuation against other assets. Therefore, an exact valuation or further details concerning the plan was not necessary in order for the trial court to provide for the future division of this asset. In cases such as these, courts typically utilize a coverture fraction in order to award each party an equitable share.

{¶62} When faced with division of a pension, of which only part was earned during the marriage, the courts will often compute "the ratio of the number of years of employment of the employed spouse during the marriage to the total

years of his or her employment." *See Hoyt v. Hoyt*, 53 Ohio St.3d 177, 182 (1990). This ratio is expressed as the coverture fraction. In the coverture fraction, the numerator is generally the number of years (or months) a pension member is employed during the marriage and the denominator is the number of years of total employment. *Smith v. Smith*, 182 Ohio App.3d 375, 2009-Ohio-2326, ¶ 95.

{¶63} The same principle may be applied when dividing a military pension. *See e.g. Lees v. Lees*, 5th Dist. No. 11CAF050039, 2012-Ohio-770 (clarifying the coverture fraction that should have been used in the Military Qualifying Order, or MQO); *Reising v. Reising*, 2d Dist. No. 2010-CA 92, 2012-Ohio-1097 (discussing whether or not the MQO dividing the military pension utilized a coverture fraction or another valuation). The Tenth District Court of Appeals recently did a detailed analysis concerning the calculation of the division of a military pension, especially when some of the service credit is earned during active duty service, and some is attributable to service in the National Guard. *See Hasselback v. Hasselback*, 10th Dist. No. 06AP-776, 2007-Ohio-762.[14]

{¶64} Even though the details concerning Sean's pension were still speculative at the time of the divorce, **the trial court had before it all of the**

---

[14] In arriving at the correct coverture fraction for the division of a military pension, the trial court and the parties must be careful to take into account any unique calculations that may be applicable, i.e., the fact that all "years" of service may not necessarily count equally towards earning retirement credit. In *Hasselback*, the Court of Appeals discussed how to utilize the "point" method to specify the spouse's portion of the National Guard pension. *Id*. at ¶ 14.

**information that was needed in order to award Christen one half of the amount of any future military pension that was attributable to the points that were earned during the marriage**. Trial courts make such awards all the time, and the United States government has published guidelines providing information concerning the division of military pensions.[15]

{¶65} Utilizing the above method, if Sean does not remain in the military and his military retirement plan never vests, neither he nor Christen would receive anything, and neither party would be prejudiced. However, if he does remain in the military and his pension eventually vests, then Christen should be entitled to her share of the pension that was earned during the marriage. *See Reising*, *supra* (finding that spouse was entitled to one-half of the military retirement benefits of the defendant which accrued between the date of the parties' marriage and the de facto termination of the parties' marriage).

{¶66} Unlike *Kindig*, where the existence and accounting of the wife's plan was not discernible, the United States government keeps detailed records of the service of its military members and their entitlement to military pay and pensions. It was not necessary for the trial court to have access to the details concerning these specific records. It merely had to direct the government as to how any future

---

[15] *See, e.g.*, "Guidance on Dividing Military Retired Pay," by the Defense Finance and Accounting Service ("DFAS"), http://www.dfas.mil/garnishment/usfspa/attorneyinstructions.html. *See*, *also*, 10 U.S.C. Sec. 1408.

pension should be divided utilizing a coverture fraction and specifying the dates that constituted the time during the marriage. There is no basis whatsoever for the majority's reliance on *Kindig*.

{¶67} The majority also attempted to explain that the trial court's decision was not "a gross inequity" when it pointed out that Christen did not live with Sean during all 15 or 16 years of his military service during the marriage and that Sean had cashed out multiple IRA's in his name during the marriage to help pay for the parties' living expenses. Again, these arguments are not supported by the record or the law, and do not serve to provide a rationalization for failing to award Christen her equitable share of Sean's potential military retirement benefit.

{¶68} First, the record does not support the majority's claim that the parties "lived essentially separate lives since the fall of 2004." The uncontroverted evidence in the record indicates that they lived apart from the fall of 2004[16] *until they reconciled during his deployment*. Although Sean was deployed to Texas from approximately July 2005 until December 2006, the mere fact that they were not living together due to his military obligation does not mean that this period of time should not count as being "during the marriage." This Court should not

---

[16] When Christen moved to Dublin to begin veterinary school at The Ohio State University, Sean stayed behind to sell the marital home. Sean testified that they were not living together as husband and wife in January 2005. (Tr. p. 199) Sean was deployed from July 2005 until December 2006, and they reconciled during this deployment. Sean testified that he went back to live with Christen in December of 2006, after his deployment ended. (*Id.* at 2002) Sean testified that they then lived together until January of 2008. (*Id.* at 203) Christen testified that they did not separate until March of 2008). (*Id.* at 145)

create a precedent that would penalize all of the spouses of our service members who are staying behind and raising families while our servicemen and servicewomen are deployed, by failing to count the time they are apart as being "during the marriage." The testimony of both parties clearly established that Christen and Sean reconciled during his deployment and lived together as husband and wife from when he returned in December of 2006 until they separated again in January or March of 2008. During the thirteen years between their marriage in January 1995 until their final separation in early 2008, the parties were only actually "separated" for approximately a year or so.

{¶69} Both parties acknowledge that they ceased living together as of early 2008, although the divorce was not finalized until March 1, 2011. Pursuant to R.C. 3105.171(A)(2)(b), a trial court has the option to select dates "that it considers equitable in determining marital property, 'during the marriage' * * *." However, it is not equitable to completely ignore a party's rights to marital property merely because the parties did not cohabitate during the entire time between the date of the marriage and the date of the final divorce decree.

{¶70} Next, the majority asserts that because the couple cashed in some IRA's (that were in Sean's name) during the marriage to pay for their living expenses, this should somehow off-set Christen's claim to any of Sean's potential military pension. For example, in 2007, Sean's earned income was less than

$10,824 and Christen had no earned income, thereby requiring the parties to cash in a $21,000 IRA and to utilize Christen's loan monies to pay the family's living expenses. (Pl. Ex. 14)

{¶71} There was absolutely no evidence in the record that these IRA's were Sean's separate property. Considering that Sean was only 22 years old when they married, and had been in the military full time for a year before then, it is highly likely that the IRA's were earned during the marriage. In any case, without any evidence to the contrary, the presumption is that the IRA's were marital property and were used to pay marital expenses – just like Christen's IRA, that was also cashed in during this time. There is no basis for giving Sean any special "credit" for the utilization of these marital funds to help support his family.

{¶72} Based on all of the above, I would find that the trial court erred as a matter of law when it mistakenly determined that Sean's unvested military pension was not subject to an equitable property division. A division of property does not have to be equal in order to be equitable. However, in this case, the trial court awarded Christen *all* of the debt and *none* of the assets. Based on the facts in this case, that was not an equitable property division. Therefore, I would sustain the first two assignments of error and remand for an equitable division consistent with the law and the facts.