[Cite as *Shoenfelt v. Shoenfelt*, 2015-Ohio-225.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

ROBERT M. SHOENFELT,

    PLAINTIFF-APPELLANT/
    CROSS-APPELLEE,                    CASE NO.  17-14-13

    v.

JENNIFER L. SHOENFELT,             O P I N I O N

    DEFENDANT-APPELLEE/
    CROSS-APPELLANT.

---

**Appeal from Shelby County Common Pleas Court
Domestic Relations Division
Trial Court No. 10DV000027**

**Judgment Affirmed**

**Date of Decision:   January 26, 2015**

---

APPEARANCES:

    *Timothy S. Sell* for Appellant/Cross-Appellee

    *Robert M. Harrelson*  for Appellee/Cross-Appellant

Case No. 17-14-13

**ROGERS, P.J.**

{¶1} Plaintiff-Appellant/Cross-Appellee, Robert Shoenfelt ("Robert"), appeals the judgment of the Court of Common Pleas of Shelby County, Domestic Relations Division, granting a decree of divorce. On appeal, Robert argues that the trial court erred by: (1) failing to order Defendant-Appellee/Cross-Appellant, Jennifer Shoenfelt ("Jennifer"), to reimburse Robert for his payment of marital debts between the de facto termination date of the marriage until the date of the final hearing; (2) determining that Jennifer's medical school loans were marital debts; and (3) determining that Robert's unvested deferred compensation assets were marital. In her cross-appeal, Jennifer contends that the trial court erred in determining that certain payments by Robert's brother and friend were marital debts and in admitting Robert's listing of the marital assets and debts. For the reasons that follow, we affirm the trial court's judgment.

{¶2} Robert and Jennifer were married on May 2, 1987. Their marriage produced two children. When Robert filed his complaint for divorce on February 12, 2010,[1] one of the children was still a minor, while the other was already emancipated. During the pendency of these proceedings, the couple's minor child reached the age of majority.

---

[1] Jennifer also counter-claimed for divorce.

{¶3} The final hearing for divorce occurred on March 13, 2010, March 15, 2010, and March 16, 2010. At the hearing, evidence was adduced concerning $70,000 in loans to Robert; Robert's deferred compensation plan; Robert's claim for reimbursement of marital debts; and Jennifer's student loans. We will discuss the evidence as it relates to each issue in turn.

*$70,000 Loan*

{¶4} Jack Shoenfelt ("Jack"), Robert's brother, testified that sometime in 1996 he loaned Robert $40,000 for the purpose of starting his own business. Jack testified that he did not take any ownership in the business. He also stated that the money was not a gift to Robert, and that he expected Robert to pay back the money. Jack also testified that around 1998 Robert offered to pay back the money, but never made any payments to Jack. Jack explained, "I told him I wanted the whole lump sum paid back to me. I didn't want a thousand dollars a month or a thousand dollars a year. I gave him $40,000, that's what I expect him to pay me back was a $40,000 lump sum." Final Hearing Tr., p. 17. Jack testified that the reason he has not made a demand for the money in the past 15 years is because Jennifer went to medical school. Jack wanted Robert to wait until Jennifer earned a doctor's salary before he paid the loan back.

{¶5} Robert testified that he also borrowed $30,000 from his college roommate, Dominic Bagnoli. He stated that Jack's and Bagnoli's loans were used

to pay operating expenses of his new business, his salary, and the salary of his staff. According to Robert, he had discussions with Jennifer about the loans and they both agreed that they would pay the loans back after Jennifer completed medical school. On cross-examination, Robert admitted that there are no promissory notes representing the $70,000 debt.

{¶6} Jennifer testified that she does not remember having conversations with Robert about the $70,000 debt. She testified:

> A: I don't recall being asked if I was in agreement with that or if, you know – [Robert] spoke with the two of those gentlemen and then, you know, said this is – this is the situation. They're willing, you know, to give me this amount of money to help me get started up in the business and, you know, that was pretty much my extent of it. I mean, I didn't handle the money, I didn't sign off on it or anything.
>
> * * *
>
> Q: Were you aware of whether there was every [sic] gonna need to be a repayment of that debt or what was your understanding as to what the relationship was with respect to [Robert] and these other gentlemen?
>
> A: I – I think initially I really wasn't sure. I kind of got the feeling that if the business took off, then you know, they might have some share in it; but I don't know if that was ever really discussed with them. That was partly my understanding.

*Id.* at p. 437-438. On cross-examination, Jennifer did acknowledge that Robert received $70,000 in loans and that they had discussions about repaying the money. She also testified, "I feel that [Robert] asked those men for that money and – and

if they're expecting it back, that he – I understand that he has a moral obligation, he feels like that's something he needs to do." *Id.* at p. 509.

*Deferred Compensation Plan*

**{¶7}** Phillip Fullenkamp testified that he is the senior vice present, chief financial officer, and treasurer for Celina Insurance Group. He testified that Robert has worked for Celina Insurance Group for 12 to 13 years as the senior vice president and chief information officer. Fullenkamp explained that the Executive Incentive and Deferred Compensation Plan ("the deferred compensation plan") is for senior executives of the company and is intended to reward executives based upon the company's performance. Regarding the deferred compensation plan, Fullenkamp stated:

> What happens is is [sic] that the – the awards are made annually, generally in March, and it's – it's a – it's a calculation based upon a formula. The awards are based – one award for each – for example, each million dollars growth in surplus or net worth of our company, there's an award made. Monies are set aside in accounts that are still in the name of the company, but are for the benefit of the executive. And then over a five year period, 20 percent per year over five years, the executives basically vest in those benefits.

*Id.* at p. 23-24.

**{¶8}** Fullenkamp testified that the money in the deferred compensation plan remains the company's money until it is fully vested and distributed. Therefore, if an executive leaves before his or her money has fully vested, he or she forfeits that money.

{¶9} Robert testified that he believes Jennifer is entitled to his deferred compensation, but only to the vested value of the plan as of November 2006.

*Robert's Claim for Reimbursement*

{¶10} Robert testified that he paid for all the marital debts after the separation and that Jennifer paid for her own living expenses, her car, and their daughter's piano lessons. Robert testified that he actually made Jennifer's car payments, but she would reimburse him every month.

{¶11} Robert and Jennifer also owned a timeshare during their marriage. Robert testified that he wanted to take the timeshare and agreed to continue to pay the loan on the timeshare. Further, Robert stated that he was not seeking reimbursement for the timeshare payments. *Id.* at p. 123.

{¶12} Robert then testified to the other marital debts he and Jennifer shared. It was stipulated that Jennifer and Robert had a Bank of America mortgage in the amount of $282,157; a Bank of America/Countrywide equity loan in the amount of $75,111; a Capital One roof loan in the amount of $19,179; a Capital One credit card with a balance of $12,278; an AT&T credit card with a balance of $15,135; a Citibank Diamond Preferred credit card in the amount of $9,558; a Key Bank credit card with a balance of $17,200; a Discover credit card with a balance of $7,211; US Bank overdraft loan in the amount of $3,945; a

Kohl's credit card with a balance of $1,197; and a Gap credit card[2] with a balance of $500.

{¶13} As to his claim for reimbursement, Robert testified:

Basis is – of this claim is that when she left, I took on all the – paying all the debts that we had accumulated while she continued her residency program to become a psychiatrist. And I've paid 'em all. You know, debt that we had accumulated as – as a married couple, I continued to pay and service. And I want reimbursement for that.

*Id.* at p. 120. Robert then testified that he paid off $222,135 in marital debt from November 2006 to the date of the final hearing. Therefore, he was asking that Jennifer reimburse him $111,067.

{¶14} Robert also asked for reimbursement for the tuition for his daughter to go to Lehman Catholic High School, and had the following relevant exchange:

Q: And have you only included in your summary the months that you paid the tuition yourself?

A: No. I'm sure there's some in there where she paid me some.

*Id.* at p. 142. Further, Robert wanted reimbursement for payments he made on the family's phone bill. Robert testified that "it was a family plan and all four of us were on it. So I was paying it. I was paying for hers, I was paying for the kids, I was paying for mine. A couple hundred bucks a month, and I continue to pay it. Some months were a lot higher depending on the activity." *Id.* at p. 147.

---

[2] Robert later abandoned his claim for reimbursement for payments made on the Gap credit card. Final Hearing Tr., p. 129.

{¶15} To support his claim for reimbursement, Robert offered Exhibits 1 and 1a through 48 and 48a. Plaintiff's Exhibits 1 through 48 were summary sheets which listed the various marital debts and the amount Robert paid on each debt each month from November 2006 until October 2010. Plaintiff's Exhibits 1a through 48a were the US Bank checking account statements that supported the summary sheets. However, on cross-examination, Robert was unable to testify how much of his payments went toward the principal amount owed on the various debts and what amount went to interest. He also could not testify if he or Jennifer were using the various credit cards after their separation in November of 2006. Robert did not offer any of the credit card statements into evidence.

{¶16} Further, Robert admitted that his summary sheets contained a mistake, testifying that they were overstated by $800 a month. This overstatement was contained in 15 of the summary sheets, and therefore, his claim for reimbursement was overstated by $12,000.

{¶17} Moreover, there were a significant number of deposits that were over $1,000 in Robert's US Bank account that he testified were probably from Jennifer. However, Robert stated that Jennifer was reimbursing him for the children's expenses and that Jennifer never gave him any money during the separation to be applied towards the mortgage or the credit card debt. *Id.* at p. 368. Robert also

testified that he did make some charges on the marital credit cards after November

2006.  For example, Robert testified:

Q:    So there are charges that have been made on that account by you after the – what you consider to be the date of separation, correct?

A:    Evidently, yes.

Q:    And, therefore, when you have made periodic payments on that Capital One credit card, as set forth in Exhibits 2 through –

A:    Yes.

Q:    – 48, you were also making payments on charges that you were continuing to incur, correct?

A:    Yes, evidently.  I don't recall very many charges on there but – I'm surprised there's any, to be honest.

Q:    But you now acknowledge that there are?

A:    I – yes, sir.

Q:    And we only have one month's statement and there are probably other month's statements with charges on it, correct?

A:    Be an assumption.

Q:    And so when you're setting forth that you want reimbursement, you're asking – also seeking reimbursement of additional charges that have been made on this account after which you claim to be the date of separation, correct?

A:    Correct.

*Id.* at p. 330.

{¶18} Robert claimed that he had an agreement with Jennifer on how they would pay their marital debts.  He explained:

A:   Yes.   We had roughly $92,000 in credit card debts, we had $75,000 in the first – the second mortgage. And I – you know, she was in a position where she was not making nearly the money she would be making 20 months hence.
So the agreement was I would pay all the marital debts. I would – I tried to get a loan for $168,000, which would cover all that amount.  Unfortunately, the housing market, as we know, tanked, and it was not easy to get a loan for $168,000.  So I couldn't do that.
But that was the amount, and she knew I went out to get a loan. I was gonna pay all the debts until she was done with residency cause I wanted her to finish her residency.  She would have gone out and been a physical therapist and made more money than as a resident; but I wanted her to finish her residency because it was important to the kids, important to me, and important to her, finish that residency.  Because then she would be making a lot of money and then some of these debts would be a lot easier to deal with.

Q:   And so what – was that the only part of this understanding is that –

A:   No.

Q:   – you would pay this?

A:   No.  She – I would pay that.  And then, when she was done with her residency she would help pay that down.  I would take the loan to my brother and to Dominic.  She would take her student loans and she'd leave the retirement stuff alone and we'd go our separate ways and she'd take her medical degree[.]

*Id.* at p. 144-145.

{¶19} Robert stated that the reason he continued to pay the marital debts during their separation was because he was relying on this agreement.  However,

Jennifer testified that there was no formal or informal agreement concerning their marital debts, only discussions. On cross-examination, Jennifer did admit that Robert suggested that he would pay the marital debts until she completed her residency and that in exchange, she would pay her entire student loan debt. *Id.* at p. 489. She also admitted that after he suggested that proposal, he did in fact pay the marital debts until she finished her residency. *Id.* at p. 489-490.

{¶20} Jennifer testified that she gave Robert money after November of 2006 to pay the marital bills.

> Q: After November of 2006, did you make any deposits or give any checks to [Robert] so he could deposit them into the joint account to pay bills?
>
> A: Yes.
>
> Q: And to pay child care expenses?
>
> A: Yes.
>
> Q: And was that done on basically a monthly basis?
>
> A: Yes.

*Id.* at p. 433. However, on cross-examination, Jennifer stated that she only made payments towards the credit card bills if she used them.

> Q: Yeah. And so – and the fact is that through – through your training, your residency, you did not contribute toward [the marital debts], did you?

-11-

A:   That's not correct actually.  I believe that I was paying towards some credit card bills when I – and if I used them, I immediately reimbursed [Robert] for them. So –

Q:   Well let me rephrase then.

A:   Okay.

Q:   So if you used a credit card that was listed on the – the stipulations –

A:   Uh-huh.

Q:   – knowing that [Robert] was paying that –

A:   Yes.

Q:   – you would reimburse him for the amount that you had used on that credit card –

A:   Yes.

Q:   – that month?

A:   Yes.

Q:   Correct?

A:   Uh-huh.

Q:   Other than that, [Robert] paid those credit cards, right?

A:   As far as I can recall.

*Id.* at p. 478-479.

{¶21} Jennifer also stated that she did not feel that she gained any benefit by having Robert service all of their marital debts while she completed her

residency. Instead, she just felt that Robert was "being an honorable person." *Id.* at p. 481.

*Jennifer's Student Loans*

**{¶22}** Robert testified that before Jennifer went to medical school, she was a physical therapist. He stated that as soon as Jennifer started to work as a physical therapist, she had the desire to become a doctor. As a result, Jennifer started taking undergraduate classes to satisfy medical school prerequisites. Robert testified that their marital income paid for those college endeavors. He also stated that he was supportive of Jennifer going to medical school. Specifically, he testified that "[t]here were two aspects of why I liked the idea of medical school. One was that's what she wanted to do. She was my spouse and I was supportive of that. And two, it was an investment." *Id.* at p. 182.

**{¶23}** Jennifer went to Wright State University to obtain her medical degree. She was in medical school from 1999 to 2003. Robert testified that during this timeframe, Jennifer was unable to earn income. Jennifer graduated medical school in 2003, but attended a five-year child psychiatry residency program. Robert testified that during the residency, Jennifer would earn anywhere from $45,000-48,000 per year.

**{¶24}** As a result of Jennifer attending medical school, Robert testified that it was necessary to take out student loans. Robert stated that the loans were taken

to cover any expense associated with medical school, but the loans were primarily used to pay for tuition and childcare expenses.  Robert testified:

> I was an executive at a company.  I was working a lot.  She was gonna take on a 70 to 80 hour week job basically to go to medical school.  So we needed – we had a child who was in kindergarten and one who was in fifth grade, and we needed extraordinary child care.

*Id.* at p. 179.

> **{¶25}** In regard to the childcare expenses, Robert testified:
>
> A:   We actually had – the first year we had a nanny that we were paying $400 a week for 52 weeks.  So that's $20,800.  I did that math in my head.  And that was claimed on our income tax.
>        We also paid tax on that.  We made FICA, we paid worker's comp, we paid state tax.  And then we paid also her medical benefits, we had benefits for her.
>
> Q:   And what did you do for the four remaining years of medical school?
>
> A:   We had an au pair from Germany.
>
> * * *
>
> A:   She was probably 19 or 20.  She was in Germany.  And her job was to help take care of your kids.  She lived in our house and she was there to take care of the kids.  She had her own room.  We paid for her food.  She gained 75 pounds when she was here and we paid for that.
>
> Q:   Did – what was the expense of the au pair?
>
> A:   It was about five grand to get her here, 140 bucks a week, I think, plus the food, plus the living, then we got a car for her.
>
> Q:   And how, [Robert], was this – the nanny, the au pair related to your wife going to medical school?

A: If she hadn't gone to medical school, we wouldn't have had those expenses. I mean, it – she was working 70 to 80 hours a week. I was in, basically, a new job as an executive of a company. I was working a lot of hours and traveling some. So we needed someone to take care of the kids more than just after-school care.

Q: Would it – would – if your wife had not gone to medical school and continue with physical therapy as – as her application [sic], would you needed an au pair?

A: We probably would not have needed an au pair. Cause we're talkin' about a 40 hour a week job versus an 80 hour a week job and the kids were at least in school at that point. So my thought is we'd have after – after-school care of some sort.

*Id.* at p. 180-182.

**{¶26}** When asked whether Robert or the marriage received any benefit from Jennifer's medical degree, Robert replied, "Other than when she was in residency the 45 to $50,000 per year that she was making was the only financial [benefit] that we received from that." *Id.* at p. 187. Robert testified that Jennifer could have made anywhere between $50,000-80,000 working full-time as a physical therapist.

**{¶27}** On cross-examination, Robert admitted that the most Jennifer made as a physical therapist was $29,601 in 1987. Robert stated that she made less in some years, but that was because she was working part-time.

**{¶28}** While Jennifer was in medical school, Robert and Jennifer maintained two separate checking accounts. One was a US Bank checking

-15-

account and the other was a Minster Bank account. Robert testified that during Jennifer's four years of medical school, they would deposit her student loans into the Minster account and pay childcare expenses out of that account. Robert then had the following relevant exchange:

Q: So the joint account at Minster was used by both of you jointly, correct?

A: I – I had access to it. I rarely used it except for paying the child care out of there.

Q: Well, did you ever transfer any money from the Minster account to the US Bank account?

A: I'm sure I did. I'm –

Q: Okay.

A: – sure I transferred the other way.

Q: And – so the joint account was strictly for purposes of depositing money from her student loans in order to pay bills, correct?

A: To pay them – primarily to pay bills? Which bills?

Q: Well, either daycare bills or –

A: It was primarily for the daycare. We paid – I know we paid the nanny out of that account.

Q: Okay.

A: We paid the au pairs [sic] out of that account.

* * *

Q:   * * * There were other expenses paid other than au pair and daycare expenses, correct?

A:   Correct.

Q:   And there were other expenses paid that didn't relate necessarily to her going to medical school, were there?

A:   Possibly, yes.

Q:   You just don't have an idea – you can't testify here today what was [sic] those other expenses that were paid from those student loans, can you?

* * *

A:   I don't have the records in front of me so no, I can't.

*Id.* at p. 207-209.

{¶29} Jennifer testified that her income in 2010 was around $167,000.  In regard to her student loans, Jennifer had the following relevant exchange:

Q:   And can you explain to the Court what those discussions included between you and [Robert]?

A:   We discussed the fact that we were at a particular standard of living at that time and that [Robert] had specifically said he did not want to compromise that standard of living; and that, you know, we needed to take out loans to allow us to maintain what we had been doing before I went to school.
      So as far as – I mean, it wasn't an extravagant standard of living, but you – you know, we still wanted to maintain whatever hobbies we had and we wanted to be able to pay the bills and we wanted to be able to pay the child care.  And, you know, with the child care, in some instances, came that extra vehicle that we needed to provide for our au pair and I'm not – I don't think our nanny used that car.  But we needed, you know, to be able to keep on going.

-17-

Q: Okay. So was [Robert] in agreement to your obtaining a student loan to pay for medical school?

A: He encouraged me to, yes.

Q: And did [Robert] further encourage you to get as much money as you could to help maintain your standard of living while you were in medical school?

A: Yes.

*Id.* at p. 397-398.

{¶30} Jennifer testified that in November of 2006 she had $254,366 in student loans, but her tuition was only $69,192 for her four years of medical school. The other student loans were primarily used to cover the extraordinary costs of daycare for her children. However, Jennifer also testified:

Q: Were – were some of the – the funds that were deposited into the Minster joint bank account, were they used for other items that were not daycare related?

A: Yeah, I – we used them sometimes when we – when one – when US Bank [account] would run a little low, we'd add some in from Minster.

* * *

Q: And that was true for all four years as far as the amounts that were in excess of your total education costs you tried to use it for daycare expense but quite often funds would be disbursed –

A: For other –

Q: – just for every-day living expenses?

A: – living expenses, yes.

-18-

*Id.* at p. 407.

**{¶31}** Jennifer testified that before she went to medical school, she would send her children to the YMCA for after school childcare. She also testified that having a nanny in 2000 cost her family around $26,500. However, her application for additional loans to cover childcare expenses was only approved for $12,856. Jennifer testified that she might have received additional loans to help cover the cost of the nanny, but could not remember. She also stated that she only employed the nanny for one year of medical school and an au pair for one year. The other two years, Jennifer and Robert hired "someone that was private," which was cheaper than the nanny and the au pair. *Id.* at p. 537. However, she still asked for the same amount of loan money. Therefore, Jennifer testified that more of the loan money would go towards living expenses as opposed to childcare expenses during these two years.

**{¶32}** While Jennifer admitted that none of her loan money was earmarked for living expenses, she claimed she did use her loans for living expenses. Specifically, Jennifer testified that she and Robert "paid for gasoline, we paid for car upkeep, we paid for – I believe we used some of that money for the purchase of one of our cars. I'm not positive. I mean, we just used it as a cushion for when we needed extra funds to go toward that US Bank account * * *." *Id.* at p. 524.

*Magistrate's Decision*

**{¶33}** After the hearing, both Robert and Jennifer filed their proposed findings of fact and conclusions of law. The magistrate issued his decision on June 6, 2011. He framed the issue regarding the termination date as "whether equity requires this court to select the earlier date of November [2006], as requested by [Robert], or the later date of December, 2009, as requested by Jennifer." (Docket No. 94, p. 6). The magistrate resolved the issue in favor of Jennifer and selected December 2009 as the termination date of the marriage.

**{¶34}** Robert objected to the magistrate's decision on June 17, 2011, on a variety of grounds including the magistrate's selection of December 2009 as the termination date of the marriage. On December 19, 2011, the trial court overruled Robert's objection regarding the magistrate's selection of December 2009 as the termination date of the marriage.

**{¶35}** The trial court issued a decree of divorce on February 21, 2012, and used December 2009 as the termination date of the marriage and distributed the marital assets and debts based on that date. Robert and Jennifer both appealed this decision to this court. *Shoenfelt v. Shoenfelt*, 3d Dist. Shelby No. 17-12-08, 2013-Ohio-1500 ("*Shoenfelt I*"). In that matter, we found that the trial court did not properly engage in the analysis mandated by R.C. 3105.171(A)(2) when setting the de facto marriage termination date and remanded the matter for the trial court

to determine an equitable termination date that was properly based on the factors set forth in *Dill v. Dill*, 179 Ohio App.3d 14, 2008-Ohio-5310 (3d Dist.), and the evidence presented.[3]  *Shoenfelt* at ¶ 26.

**{¶36}** On remand, the magistrate engaged in the analysis mandated by R.C. 3105.171 and considered the *Dill* factors.  It selected November 2006 as the termination date of marriage and distributed the marital assets and debts as to that date.  Specifically, the magistrate recommended that Robert's $70,000 in loans from his brother and friend be considered a marital debt.  It also recommended that a qualified domestic relations order ("QDRO") be issued to allow Jennifer to receive one-half of Robert's deferred compensation plans, vested and unvested, as of November 2006, "payable to [Jennifer] once the unvested portion of the deferred compensation plans becomes fully vested."   (Docket No. 171, p. 8). Moreover, the magistrate recommended that the trial court deny Robert's request to be reimbursed for one-half of all the marital debt he paid from November 2006 through September 2010.  Instead, "[t]he court should find that both parties made payments on necessities, including mortgage payments, etc.  The court should further find that it would be impossible with the information provided to attempt to net such payments out, especially since they were for marital obligations for

---

[3] Our decision in *Shoenfelt I* also found that the trial court erred in requiring Robert to pay the full amount of money charged for the transcription of the proceedings of the first appeal.  *Shoenfelt*, 2013-Ohio-1500, ¶ 29.

which both parties were responsible." (*Id.* at p. 10). Lastly, as to Jennifer's student loans, the magistrate stated,

> This court should find that the entire Sallie Mae student debt incurred by [Jennifer] was a benefit to both parties. It enabled both to enhance their respective careers, and it caused [Jennifer's] earnings to increase to such a level that [Robert] now has no obligation to pay [Jennifer] spousal support, because there is no longer a disparity in their respective incomes. Accordingly, the court should find that the entire student loan debt is a marital asset and should be divided equally as part of the division of assets and liabilities between the parties.

(*Id.* at p. 9-10).

{¶37} After adding up each party's debts and assets, the magistrate recommended that Robert pay Jennifer a sum of $44,200 so both would be in debt in the sum of $209,948. The magistrate stated that he believed "[f]rom the financial information presented, * * * plaintiff has the ability to borrow the equalization sum." (*Id.* at p. 12).

{¶38} On October 7, 2013, Robert filed his objections to the magistrate's decision. Specifically, Robert objected to the denial of his request to be reimbursed an amount of $105,068, which was one-half of the marital debt he paid after the de facto date of termination. Robert also objected to the classification of Jennifer's medical school loans as marital debt and argued that they should be allocated solely to Jennifer. Next, Robert objected to the magistrate's finding that Jennifer was entitled to one-half of his deferred compensation plans.

{¶39} Jennifer filed her objections to the magistrate's decision on October 17, 2013. Jennifer objected to the magistrate's finding that Robert's $70,000 in loans were marital debts. She argued that the loans are unenforceable and should not be categorized as marital debt. However, Jennifer argued that if the court did find the loans to be marital debt, it should allocate one-half of the debt to herself, so she has the ability to contest validity of the debt in a separate proceeding.

{¶40} On January 17, 2014, the trial court issued its decision which adopted the magistrate's recommendation that November 2006 be the de facto date of termination. The trial court also overruled all of the objections raised by Robert and Jennifer. It found that Robert did not provide sufficient evidence to permit the court to order reimbursement of the marital debts he paid since November 2006. Further, the court found that Robert's deferred compensation plan was a marital asset and should be divided evenly between the two parties. In regard to Jennifer's student loans, the trial court found that since her "education would increase her financial contribution to the marriage, the loans as well as the excess which was spent on daycare, etc., benefitted both parties" and found that the magistrate properly classified the student loans as marital debt. (Docket No. 188, p. 4). The trial court also agreed with the magistrate that Robert's $70,000 in loans should be classified as a marital debt.

{¶41} It is from this judgment that both Robert and Jennifer appeal, presenting the following assignments and cross-assignments of error for our review.

*Robert's Assignment of Error No. I*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT APPELLEE WAS NOT RESPONSIBLE FOR THE REIMBURSEMENT TO APPELLANT FOR THE MARITAL DEBTS PAID BY APPELLANT FROM THE DE FACTO DATE OF TERMINATION OF THE MARRIAGE UNTIL THE DATE OF THE FINAL HEARING.**

*Robert's Assignment of Error No. II*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THE APPELLEE'S MEDICAL SCHOOL LOANS WERE MARITAL DEBTS.**

*Robert's Assignment of Error No. III*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT APPELLANT'S UNVESTED DEFERRED COMPENSATION ASSETS WERE MARITAL.**

*Jennifer's Cross-Assignment of Error No. I*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT THE TWO PAYMENTS TOTALING $70,000 FROM APPELLANT-PLAINTIFF'S BROTHER AND APPELLANT-PLAINTIFF'S FRIEND CONSTITUTED MARITAL DEBT AND, EVEN IF THE $70,000 DID CONSTITUTE MARITAL DEBT, THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOCATING THE $70,000 DEBT SOLELY TO APPELLANT-PLAINTIFF AND NOT DIVIDING IT EQUALLY BETWEEN THE PARTIES**

**PURSUANT TO AN EQUITABLE DIVISION OF ASSETS AND LIABILITIES.**

*Jennifer's Cross-Assignment of Error No. II*

**THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING APPELLANT-PLAINTIFF'S EXHIBITS 1 AND 1A THROUGH 48 AND 48A OVER OBJECTION WHERE SUCH ADMISSION MATERIALLY PREJUDICED JENNIFER BECAUSE THEY DID NOT FAIRLY REPRESENT THE ALLEGED MARITAL DEBTS.**

*Robert's Assignment of Error No. I &
Jennifer's Cross-Assignment of Error No. II*

**{¶42}** In his first assignment of error, Robert contends that the trial court erred by denying his request to be reimbursed for the marital debts he paid from November 2006 through September 2010. Jennifer argues in her second cross-assignment of error that the trial court abused its discretion in admitting Plaintiff's Exhibits 1 and 1a through 48 and 48a because such exhibits did not fairly represent the alleged marital debts. We disagree with Robert's argument, and as a result, find that Jennifer's contention is moot.

*Standard of Review*

**{¶43}** In a divorce action, trial courts have broad discretion in allocating marital assets. *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, ¶ 5; *Schwarck v. Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, ¶ 15. Therefore, "A trial court's allocation of marital property and debt will not be reversed absent an abuse of discretion." *Stump v. Stump*, 3d Dist. Logan No. 8-07-

11, 2007-Ohio-6553, ¶ 8, citing *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 131 (1989). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 16-18 (2d Dist.). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

*Claim for Reimbursement*

{¶44} A trial court is within its discretion to "award a credit to the party who uses his or her own separate funds to make mortgage or other loan payments while the divorce is pending." *Shattuck v. Shattuck*, 153 Ohio App.3d 622, 2003-Ohio-4230, ¶ 25 (7th Dist.), citing Turner, *Equitable Distribution of Property*, Section 6.25, 441 (2d Ed.1994). Such a request will be denied however, if the payments were made with marital funds. *Id.* Further, a trial court may also deny a claim for reimbursement for mortgage payments when the spouse retains exclusive use and possession of the marital home. *See Wu v. Li*, 12th Dist. Butler No. CA-2012-04-091, 2013-Ohio-527, ¶ 13. Since the spouse receives the benefit from paying down the mortgage and retaining the marital home, he or she should "bear more financial responsibility for the house during the pendency of the divorce * * *." *Bass v. Bass*, 2d Dist. Montgomery No. 25922, 2014-Ohio-2667, ¶ 16; *see*

-26-

*also Stacy v. Stacy*, 11th Dist. Ashtabula No. 2004-A-0076, 2005-Ohio-5289, ¶ 36 (trial court did not abuse its discretion in failing to credit wife with mortgage payments made during parties' separation since wife had benefit of living in house and husband did not); *Patridge v. Matthews*, 12th Dist. Brown No. CA2000-04-007, 2001 WL 171011, *4 (Feb. 20, 2001) (trial court did not abuse its discretion in failing to credit husband with mortgage payments made after the parties' separation when he continued to live in the house).

**{¶45}** Robert argues that he should be reimbursed for one-half of all the marital debt he paid with his separate money during the pendency of the divorce proceedings. Specifically, Robert is seeking reimbursement for payments made on the mortgage, home equity loan, timeshare payments, a roof loan, and numerous credit cards.

**{¶46}** First, we do not find that the trial court abused its discretion in denying Robert's reimbursement for payments made on the mortgage, home equity loan, or the roof loan. Jennifer moved out of the marital residence in November of 2006, and eventually bought her own house. Therefore, Jennifer incurred her own expenses in obtaining and maintaining her separate residence. Robert was in sole possession of the marital home during the divorce, and as such, he should bear more financial responsibility for the house.

**{¶47}** Likewise, we do not find that the trial court abused its discretion in denying Robert's request for reimbursement on any payments he made on the timeshare during the pendency of the divorce. At the final hearing, Robert stated that he was not seeking reimbursement for payments he made on the timeshare. Therefore, he cannot ask, for the first time on appeal, to be reimbursed for payments he made on the timeshare. *See Dolan v. Dolan*, 11th Dist. Trumbull Nos. 2000-T-0154, 2001-T-0003, 2002-Ohio-2440, ¶ 7 ("It is well established that a party cannot raise any new issues or legal theories for the first time on appeal.").

**{¶48}** As to the marital credit card debt that Robert paid throughout the pendency of the divorce proceedings, Jennifer argues that he is not entitled to reimbursement because she provided him with financial assistance to pay such debts. In support of her argument, Jennifer cites *Shattuck*, which held that a claim for reimbursement should be denied if payments were made with marital funds. 2003-Ohio-4230, 153 Ohio App.3d 622, ¶ 25. In *Shattuck*, the court denied appellant's claim for reimbursement because he had not provided the court with evidence that he actually used separate funds to make payments on a car loan. *Id.* at ¶ 33. The court also found that it was significant that the appellant did not request temporary orders from the trial court concerning the car loan. *Id.* However, the court stated that it was not suggesting that the "failure to request

temporary orders concerning debt payments is always fatal to a request for reimbursement of those payments during the final divorce proceedings." *Id.*

{¶49} We find that the present case is distinguishable from *Shattuck*. First, there was evidence presented that Jennifer did not contribute to paying the credit card debts after the de facto date of termination. Jennifer admitted that her deposits into Robert's US Bank account were to cover expenses for the children and to reimburse Robert on payments he made on her behalf for her car and her life insurance. She also stated that these deposits would reimburse Robert for when she used the marital credit cards after the date of their separation. However, she would only reimburse Robert for the amount she used that month. *See* Final Hearing Tr., p. 478-479. Otherwise, Robert paid all of the credit card bills.

{¶50} Moreover, in *Shattuck*, the court found that the appellant's failure to request temporary orders was a strong indication that the payments were made voluntarily. Here, Robert testified that the payments he made on the credit card debts were not voluntarily, but instead, in reliance of the alleged agreement he had with Jennifer that he would pay the marital debts if she paid her student loans. Conversely, Jennifer testified that there was no formal agreement and that Robert was paying the debts voluntarily because he was an honorable man. Thus, there was a dispute at the final hearing whether Robert voluntarily made these payments.

**{¶51}** However, Robert admitted that he used some of the credit cards after the de facto date of separation for his exclusive benefit.  *See* Final Hearing Tr., p. 331.  Further, Robert admitted at the final hearing that some of his exhibits were inaccurate and contained mistakes.  For example, he admitted that certain summary sheets were overstated by $800 and that his reimbursement claim was overstated by $12,000.  Moreover, Robert could not account for many deposits that were made into his bank account that were comingled with his own money to pay mortgage payments, his daughter's tuition, his family's phone bill, and credit card debt.  He testified that these payments possibly could have come from Jennifer and possibly could have been used to pay the marital debts.

**{¶52}** With the evidence presented at the final hearing, we cannot say that the trial court abused its discretion in denying Robert's claim for reimbursement.  We agree with the trial court that it would be too speculative to try to sort out the separate payments made by both parties on joint obligations with the evidence before us.  Since the trial court did not rely on Robert's exhibits in its determination, we find that Jennifer's second cross-assignment of error is moot and elect not to address it.  App.R. 12(A)(1)(c).

**{¶53}** Accordingly, we overrule Robert's first assignment of error.

Case No. 17-14-13

*Robert's Assignment of Error No. II*

**{¶54}** In his second assignment of error, Robert contends that the trial court abused its discretion by finding that Jennifer's student loans were marital debt and allocating them equally between both parties. We disagree.

**{¶55}** Student loans obtained by one spouse during the marriage may be categorized as marital debt subject to equal distribution. *Harris v. Harris*, 5th Dist. Licking No. 2006-CA-00003, 2007-Ohio-1232, ¶ 34; *Webb v. Webb*, 12th Dist. Butler No. CA97-09-167, 1998 WL 820838, *4 (Nov. 30, 1998). Although a trial court may conclude that student loans are marital debt, the debt may properly be allocated to the party who incurs the debt. *Webb* at *4; *Thill v. Thill*, 2d Dist. Clark No. 2001-CA-23, 2001 WL 929995, *4 (Aug. 17, 2001). Courts have considered different factors when determining the allocation of student loan debt. Such factors include: when the income generated by the degree was realized; whether the spouse undertaking the degree was not working while obtaining the degree, thus, depriving the family of additional income; and whether the student loans were used to pay for family expenses. *Webb* at *4-5.

**{¶56}** Jennifer cites to a Ninth District Court of Appeals opinion, which states that "[t]he notion that the degree-earning spouse is the sole beneficiary of the earned degree, and hence should shoulder all of the student-loan debt, is inherently flawed." *Polacheck v. Polacheck*, 9th Dist. Summit Nos. 26551, 26552,

-31-

2013-Ohio-5788, ¶ 28.[4]  Instead, the court in *Polacheck* stated that "when equitably dividing marital student-loan debt, the trial court must examine all of the relevant circumstances of the parties including the parties' relative economic circumstances and ability to pay the debt as well as any other factor the court finds to be relevant and equitable." *Id.* at ¶ 33.

**{¶57}** Here, the trial court classified Jennifer's student loans as marital debt and allocated it equally between both parties.  In support of its decision, the trial court stated that Jennifer's "education would increase her financial contribution to the marriage, [and] the loans as well as the excess which was spent on daycare, etc. benefitted both parties * * *." (Docket No. 188, p. 4).

---

[4] We note that we do not agree with *Polacheck*'s cursory analysis of our decision *Daniel v. Daniel*, 3d Dist. Mercer No. 10-11-09, 2012-Ohio-5129, *rev'd on other grounds*, 139 Ohio St.3d 275, 2014-Ohio-1161. The court in *Polacheck* suggested that our court specifically reasoned that because the wife would not realize her increased earning potential until after the marriage had ended, she was the only person who would benefit from her degree, and thus, equity required that she bear the full responsibility for repaying her student loans. *Polacheck*, 2013-Ohio-5788, ¶ 26. In *Daniel*, this court certainly considered the fact that the wife earned her degree near the end of the marriage and that she was the only party to realize the financial benefit from her degree. *Daniel* at ¶ 22. However, we did not base our decision to affirm the trial court's allocation of the entire student debt to the wife on that single factor. Indeed, we specifically stated, "*To begin with*, Christen will incur the direct benefit from her degree, not Sean." (Emphasis added.) *Id.* We then devoted the rest of the analysis to other important circumstances that made the facts of *Daniel* unique. For example, our decision focused on the fact that the wife engaged in financial misconduct with her student-loan money. *Id.* at ¶ 23-24. Not only did she use her loan money to buy a car for her boyfriend, but she also spent most of her loans on items that were not considered qualifying educational expenses. *Id.* at ¶ 23. This court also considered the fact that the husband was currently enrolled in college and was incurring his own student loan debt. *Id.* at ¶ 22. We noted that the husband supported the wife while she was obtaining her veterinarian degree, not only paying for living expenses for the wife and their children, but also paying the marital debts and obligations by cashing in his IRA and working several part-time jobs. *Id.* Further, *Daniel* recognized that the husband had no control over the wife's borrowing or spending when she accumulated the majority of her debt. *Id.* at ¶ 23. Therefore, we did not base our decision on a single factor as the court in *Polacheck* suggested, but instead considered all of the relevant circumstances of the case.

{¶58} First, we acknowledge that there is some dispute as to whether Jennifer's student loans were used to pay for living expenses. It seems uncontested that during the first two years of medical school, Jennifer and Robert used the majority, if not all, of the loan money to cover costs associated with medical school, such as tuition and childcare. There was testimony that Robert and Jennifer employed a nanny and then an au pair during the first two years of medical school, costing the family over $25,000 a year. However, Jennifer testified that during her last two years of medical school she hired a private babysitter for her children, which was significantly cheaper than the nanny and the au pair. She stated that she still requested the same amount of loan money, and that more of the loan money during her last two years of medical school was used for living expenses rather than childcare. Therefore, while it does not seem that an extraordinary amount of loan money was used to cover living expenses, this factor would still weigh in favor of allocating the student-loan debt equally.

{¶59} Further, Jennifer testified that before she went to medical school, she and Robert discussed taking out student loans and how they did not want to sacrifice their standard of living while Jennifer was in school. According to Jennifer, Robert encouraged her to take out as many loans as possible in order to maintain their lifestyle. This is supported by the fact that Jennifer has $254,366 in student loans, but only $69,192 was for tuition. We find it significant that Robert

not only knew how many loans Jennifer was taking out, but actually encouraged her to take out as many as possible to support their lifestyle.

{¶60} However, we do not find that Robert received any significant financial benefit from Jennifer's advanced education. While Robert certainly received a benefit by the fact that he did not have to pay Jennifer any spousal support, he did not experience an "increase[d] financial contribution to the marriage" as the trial court found. Instead, at the final hearing, evidence was presented that Jennifer only made $41,674 in 2004; $41,663 in 2005; and $45,092 in 2006. Only after Jennifer completed her residency in 2008, two years after the de facto date of termination, did her income nearly triple as she was making more than $150,000 as a psychiatrist.

{¶61} Therefore, some factors weigh in favor of splitting the student loan debt equally, while other factors weigh in favor of allocating the entire student loan debt to Jennifer. As such, we cannot say that the trial court abused its discretion in equally allocating the student loan debt between Jennifer and Robert.

{¶62} Accordingly, Robert's second assignment of error is overruled.

*Robert's Assignment of Error No. III*

{¶63} In Robert's third assignment of error, he argues that the trial court erred in awarding Jennifer one-half of his unvested deferred compensation. We disagree.

{¶64} It is well-established that "[a] vested pension plan accumulated during the marriage is a marital asset and must be considered * * * in dividing marital assets and liabilities." *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 132 (1989). Further, a trial court "may also consider the value of an unvested pension plan as a marital asset for purposes of reaching an equitable distribution." (Emphasis deleted). *Kindig v. Kindig*, 3d Dist. Allen No. 1-10-13, 2010-Ohio-4805, ¶ 12, citing *Lemon v. Lemon*, 42 Ohio App.3d 142, 144 (4th Dist.1988). While "it may be difficult to ascertain the value of benefits that have not yet vested and may never vest[,] * * * it does not follow that those future benefits have no value." *Daniel v. Daniel*, 139 Ohio St.3d 275, 2014-Ohio-1161, ¶ 10.

{¶65} "[W]hen circumstances permit, [trial courts] should strive to resolve the issues between the parties so as to disassociate the parties from one another or at least minimize their economic partnership." *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 182 (1990). But the trial court must also "obtain a result which will preserve the asset so that each party can procure the most benefit." *Id.* at 181. The Ohio Supreme Court in *Hoyt* recognized that "while it is desirable to bring finality to the parties' marriage by dividing assets once and for all, doing so is not possible in all cases, because it sometimes leads to an inequitable result." *Daniel* at ¶ 13.

{¶66} As part of his position at Celina Insurance Group, Robert is covered under an executive incentive and deferred compensation plan. The funds are

property of Celina Insurance Group until they vest, and the vesting of the funds occurs over a five-year period. This provides an incentive for senior executives of the corporation to remain with the company long-term.

{¶67} Robert argues that his unvested deferred compensation plan is not marital property and it was inequitable for the trial court to award Jennifer a portion of the unvested plan. He argues that if he gets terminated or quits his job before the unvested portion becomes vested, he will "be held accountable for a[n] * * * asset that never entered his possession or control." Appellant/Cross-Appellee's Br., p. 18. However, the trial found that the unvested contribution plan would be divided only to the extent the contributions become vested. Moreover, all of Robert's unvested deferred compensation that is subject to the divorce decree has already been vested and is available to Robert. Therefore, his fears are unfounded and his arguments are meritless.

{¶68} Accordingly, we overrule Robert's third assignment of error.

*Jennifer's Cross-Assignment of Error No. I*

{¶69} In her first cross-assignment of error, Jennifer argues that the trial court abused its discretion in determining that the $70,000 loan from Jack and Bagnoli constituted marital debt. Further, she argues that even if the $70,000 loan did constitute marital debt, it should have been allocated equally between the parties. We disagree.

Case No. 17-14-13

**{¶70}** In divorce proceedings, the trial court must classify property as either marital or separate and then award each spouse his or her separate assets. *Gibson v. Gibson*, 3d Dist. Marion No. 9-07-06, 2007-Ohio-6965, ¶ 29. "Property acquired during a marriage is presumed to be marital property unless it can be shown to be separate." *Hall v. Hall*, 3d Dist. Hardin No. 6-10-01, 2010-Ohio-4818, ¶ 6, citing *Barkley v. Barkley*, 119 Ohio App.3d 155, 160 (4th Dist.1997).

**{¶71}** Trial courts are vested with broad discretion when fashioning equitable divisions of marital property. *Link v. Link*, 3d Dist. Mercer No. 10-11-21, 2012-Ohio-4654, ¶ 58; *Hendricks v. Hendricks*, 3d Dist. No. 15-08-08, 2008-Ohio-6754, ¶ 25. Accordingly, divisions of marital property are only reversed upon a showing of an abuse of discretion. When dividing marital property, "a trial court must generally assign and consider the values of marital assets in order to equitably divide those assets." *Schwarck*, 2012-Ohio-3902, ¶ 26.

> In any divorce action, the starting point for a trial court's analysis is an equal division of marital assets. However, R.C. 3105.171(C) clearly provides that where an equal division would be inequitable, a trial court may not divide the marital property equally but instead must divide it in the manner the court determines to be equitable.

*Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, ¶ 5.

**{¶72}** First, Jennifer argues that the two loans from Jack and Bagnoli are unenforceable legal debts and should not be categorized as marital debts. Therefore, Jennifer had the burden to show that the $70,000 loan was not marital

by showing that it was unenforceable. However, she did not properly join Jack and Bagnoli as parties to the divorce proceeding so that the issue could be properly presented before the trial court. Nor did Jennifer present the trial court with a declaratory judgment which stated that the two loans were unenforceable.

{¶73} Jennifer also argues that the trial court erred when it allocated the full $70,000 loan to Robert. Jennifer argues that this is inequitable because Jack and Bagnoli might never enforce the payment of the loan, and thus "Robert will receive a windfall since he will have received an unintended greater share of the marital estate as part of the trial court's equal division of assets and liabilities." Appellee/Cross-Appellant's Br., p. 32. Initially we note that at the final hearing, Jack testified that his loan was not a gift and that he expects to be paid back once Robert and Jennifer's divorce is finalized. Robert also testified that he has a moral, if not legal obligation, to repay both loans. Thus, we have no reason to suspect that Robert will not repay the loan and receive a "windfall" as Jennifer suggests.

{¶74} Further, this allocation was only one portion of the trial court's overall distribution of Robert and Jennifer's assets and debts. The distribution resulted in Jennifer being awarded one-half of Robert's vested and unvested deferred compensation as well as allocating Jennifer's student loan debt equally between both parties. Moreover, Robert's claim for reimbursement was denied.

Looking at the trial court's entire distribution of Jennifer and Robert's marital assets and debts, we cannot say that the distribution was inequitable or that trial court abused its discretion in allocating the $70,000 business loan solely to Robert.

{¶75} Accordingly, we overrule Jennifer's first cross-assignment of error.

{¶76} Having found no error prejudicial to Robert or Jennifer in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**SHAW, J., concurs.**

**PRESTON, J., concurs in Judgment Only.**

**/jlr**